Earl Carl **HEISELBETZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 71396.

Court of Criminal Appeals of Texas, En Banc.

June 28, 1995.

Rehearing Overruled Sept. 20, 1995.

John S. Walker, Center, for appellant.

Charles R. Mitchell, Dist. Atty., San Augustine, Robert Huttash, State's Atty., Austin, for the State.

*OPINION*

KELLER, Judge.

Appellant was convicted in November 1991 of capital murder under section 19.03(a)(6)(A), Tex.Penal Code, for a double murder committed on May 30, 1991. After the jury returned affirmative findings to the two special issues submitted pursuant to Ar-

ticle 37.071(b),[1] appellant was sentenced to death under Article 37.071(e). Direct appeal to this Court is mandated by Article 37.071(h). Appellant raises thirty-three points of error. We affirm.[2]

## I. Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence in various points. We will address each of these points separately after a brief account of the offense.

■ Sufficiency reviews require that, while viewing the evidence in the light most favorable to the verdict, we ask whether any rational trier of fact could have found the elements being challenged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Nelson v. State,* 848 S.W.2d 126, 131 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993). The jury is the sole judge of the weight of the evidence and may choose to believe all, some, or none of it. *Chambers v. State,* 805 S.W.2d 459, 461 (Tex.Crim.App.1991). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Losada v. State,* 721 S.W.2d 305, 309 (Tex.Crim.App. 1986). And, in answering the special issues raised under Article 37.071(b), the jury may consider evidence admitted at both the guilt-innocence and punishment stages of trial. *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Crim. App.1987). Reviewed under the *Jackson* standard, the record establishes the following facts:

Appellant was the victims', Rena and Jacy Rogers, closest neighbor. His home was about two tenths of a mile away from the Rogers' home, which was secluded and not visible from the road. Evidence was introduced that before the Rogers had moved into the house, appellant had actually broken into the locked house and had acknowledged at that time that he could get into the house whenever he wanted.

On Friday, May 24, 1991, the Rogers family—Rena, Bob, and their daughter Jacy—left their home to spend the long Memorial Day weekend out of town. They left their two watchdogs outside to guard their home. On Tuesday morning, May 28, 1991, the Rogers returned home. But, since Bob wanted to go straight to work, Rena dropped him off at his job in Lufkin before going home. Bob arrived at work sometime between 10:30 and 11:00 a.m. When Bob returned home from work that evening he discovered that the two dogs were missing. On June 2, 1991, Bob Rogers' brother-in-law found the carcass of one of the missing dogs in the vicinity of the Rogers' and appellant's houses. The dog had been shot.

The Rogers' telephone records showed that on May 28, 1991 at 10:01 and at 10:02 a.m., calls were made from the Rogers' home to the Multiquest Sweepstakes at a "900" telephone number. The Rogers were not home at the times the calls were made and no one had permission to be in their home. The evidence also established that on that same day, Tuesday, May 28, 1991, appellant told his wife, Becky, that he had been bitten that morning by a dog. When she saw him later, he had a bite on his finger and scratches on his arms, and he was very upset.

Evidence was introduced that appellant liked to participate in sweepstakes contests and that he had informed his wife of his interest in participating in the "dial 900" telephone sweepstakes, but his wife had discouraged him because of the cost.

From this evidence a rational juror could conclude that on Tuesday, May 28, 1991, appellant entered the victims' home and placed the "900" calls which mysteriously appeared on their telephone records, and that in the course of entering the Rogers' home, appellant killed their two watchdogs.

The evidence also established that on Thursday, May 30, 1991, a neighbor saw Rena and Jacy Rogers at the grocery store at about 9:30 in the morning. Rena had

---

**1.** All references to articles are to the Texas Code of Criminal Procedure unless otherwise indicated.

**2.** We note that the portions of this opinion addressing points of error pertaining to guilt/innocence were adopted, with few changes, from an opinion authored by Judge Miller.

planned to meet her sister-in-law, Natalie Whitton, at 11:30 a.m. to travel together to Nacogdoches; Rena planned to take Jacy. That morning Natalie had confirmed plans over the telephone with Rena but, without explanation, Rena failed to show up at the appointed place and time. Her car keys, purse, and a jar of coins were missing from the Rogers' home, but there was no sign of foul play at the home. Rena's car was parked in her driveway.

Almost a month later, on June 27, 1991, the human skeletal remains of an adult female and child were found in and around a barn in Tyler County. The remains were identified through dental and medical records as those of Rena and Jacy Rogers.

Appellant had been questioned by the Sabine County Sheriff on the day of the offense and had responded questionably when asked about his whereabouts. His dubious answers made him a potential suspect; so, on the day the remains were discovered, he was questioned again. At this interview, conducted in the presence of his wife and at a relative's home, appellant voluntarily confessed to the murders.[3]

Appellant subsequently signed a written confession stating that he killed the victims at around 11:00 a.m. on Thursday, May 30, 1991. Appellant confessed to putting the two bodies into Rena's car and driving them some miles away to the barn where they were found. He also stated that when he returned from hiding the bodies in the barn, he parked Rena's car back at her house, then went into the Rogers' home and got a package of frozen hamburger meat and some canned tomato sauce, which he took home. When asked how he had killed the victims appellant answered that he did not know, that he had blacked out, but he noted that he remembered marks on the victims' necks. The interviewer asked if he had strangled the victims, and appellant answered that he did not think so. A few days following his confession, appellant guided the police investiga-

tors on the route that he had taken after killing Rena and Jacy and showed them where he had thrown Rena's purse in a pond. The purse, containing Rena's identification, was recovered from the pond. It appeared that an attempt had been made to burn the purse and the items in it.

The incomplete skeletal remains of the infant evidenced no trauma which could in turn suggest a cause of death. The skeletal remains of Rena, however, evidenced a condition known to forensic anthropologists as "pink tooth." This condition appears in the teeth of those who have died of asphyxiation. A forensic anthropologist testified that strangulation was a possible cause of death of Rena Rogers.[4]

A court appointed psychiatrist testified that he had examined appellant and that there was nothing in the examination that would explain or excuse appellant's actions. The psychiatrist also opined that the head injuries sustained by appellant in a traffic accident in 1975 could not have caused the amnesia which appellant claimed in his confession.

Mindful that appellant confessed that he killed the victims, and reviewing the evidence in the light most favorable to the verdict, the record supports the following version of the offense:[5] The appellant knew how to and actually had entered the Rogers' home on the morning of Tuesday, May 28, 1991, to make "900" sweepstakes calls from their telephone. He had been attacked by the watchdogs, and he had killed the animals. On the morning of Thursday, May 30, 1991, appellant re-entered the Rogers' home. Apparently he believed that Rena Rogers had gone for the day, and he decided to again make "900" telephone calls. Unfortunately, appellant was surprised by Rena, returning from the grocery store. Appellant strangled Rena and then strangled her two year old daughter, Jacy, in their home. He then, in the relative seclusion of the Rogers' home, loaded the victims' bodies into Rena's car and

---

3. We note that appellant's confession offered no details as to how the victims were murdered. Indeed, appellant "guessed" that he murdered the victims.

4. "Pink tooth" does not occur in infants.

5. This version of events is the theory of the offense presented by the State.

transported them to the barn where they were found a month later. When he returned Rena's car to the Rogers' driveway, he re-entered the victims' home to remove any evidence of foul play and took the tomato sauce and frozen hamburger meat. He later disposed of Rena's purse and keys.[6]

In point of error twenty-nine, appellant challenges the sufficiency of the evidence to establish that the murders of the two victims occurred in the same criminal transaction. Tex.Penal Code § 19.03(a)(6)(A). He correctly argues that to establish "the same criminal transaction," the evidence must establish that there was a "continuous and uninterrupted chain of conduct occurring over a very short period of time, and that both killings occurred in a rapid sequence of unbroken events...." *Vuong v. State*, 830 S.W.2d 929 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). However, if the evidence supports the rational inference that both victims were killed in the same criminal transaction, we will not disturb the jury's verdict. *See Narvaiz v. State*, 840 S.W.2d 415, 426 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

The victims, mother and child, were seen together and expected at an appointment together on the morning of their murder. They were last seen at 9:30 a.m. and appellant confessed to having killed them together at around 11:00 a.m. Appellant confessed to having transported and disposed of their bodies together and their remains were found together. The evidence supports a finding that the two victims were killed during the same criminal transaction. *See Rios v. State*, 846 S.W.2d 310, 314–315 (Tex. Crim.App.1992). Appellant's twenty-ninth point of error is overruled.

In his thirtieth point of error, appellant challenges the sufficiency of the evidence to identify the child victim as Jacy Rogers. Appellant confessed to the murders of Rena Rogers and her child, Jacy, and to depositing their bodies where their remains were found. From this evidence alone the jury could reasonably conclude that the skeletal remains of the child found with the remains of Rena Rogers were those of Jacy Rogers. But, medical records were also introduced that indicated that Jacy Rogers had suffered a broken clavicle; the skeletal remains indicated that the child had a healed broken clavi-

---

**6.** Appellant offered in his confession that Rena Rogers had come to his gate on the morning of May 30, 1991, with Jacy, cussing and carrying on, and accusing him, apparently, of shooting her dogs. He turned to walk away, felt a pain in his leg, and realized he had been shot. He went into the house to take care of his leg, and when he came back out a significant time later, Rena was still there. She threw something at him, and when he ducked he hit his head on and fence post and blacked out. When he came to, both Rena and Jacy were dead; he guessed that he had killed them.

But, remembering that the jury may believe or disbelieve any of the evidence, *Chambers*, 805 S.W.2d at 461, and reviewing the record the light most favorable to the verdict, *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, the evidence supports a version of events vastly different from that related by appellant.

For example, appellant claimed that the murders occurred on his property after an altercation provoked by Rena Rogers. Appellant even claimed that she shot him, waited for him to come back out of his home, and then threw something at him. But, the assistant director of the Jefferson County Regional Crime Lab testified that she examined the holes in the blue jeans appellant wore the day of the murders, and that

there was no evidence that the holes were caused by bullets. And, the physician who had examined the lesions on appellant's leg opined that the injury did not look like a gunshot wound and was not characteristic of a recent wound but appeared to have been a year or two old.

Moreover, it was established that Rena Rogers was a small woman, standing under five feet tall and weighing no more than ninety pounds— compared to appellant, a large and strong man, weighing about 250 pounds at the time of the murders. It was also established that on the morning of the offense, Rena Rogers was busy preparing to go on an out-of-town trip at 11:30 a.m. She was seen at the grocery store at around 9:30 and appellant confessed to killing her around 11:00 a.m. Under these facts, a rational juror could reasonably reject appellant's assertion that Rena, a petite woman, on a morning in which she was busy preparing to go out of town, toted a gun and her infant daughter across two-tenths of a mile to provoke a violent confrontation over two missing dogs with a man much larger and stronger then herself, and that after shooting him waited there a good time for him to return.

The jury apparently rejected appellant's version of the offense; the evidence supports their decision as reasonable.

cle. And, the clothing remains found on the child's skeletal remains were identified by Sheila Whitton as those worn by Jacy. The evidence was sufficient to support the jury's finding that the child victim was Jacy Rogers. Point of error thirty is overruled.

In his thirty-first point of error appellant claims the evidence is insufficient to prove beyond a reasonable doubt that he acted "deliberately and with reasonable expectation that death" would result. *See* Art. 37.071(b).[7]

■ Appellant confessed that he committed the murders of both Rena and her child, Jacy. Forensic evidence was introduced suggesting that the victims died of asphyxiation, and appellant himself confessed that the bodies had marks on their necks. This evidence supports the conclusion that appellant killed the victims by strangulation. We have held that the act of killing a human being by strangulation reasonably supports a conclusion that a killer acted deliberately; it is a laborious and time consuming method of killing, normally requiring several minutes of strong pressure. *See Chambers v. State,* 866 S.W.2d 9, 16 (1993). Here the evidence indicates that appellant killed not one, but two people by strangulation. This doubles the time and effort required to commit the offense. Given these facts, a rational factfinder could reasonably find that appellant acted with deliberation in killing the victims. Point of error thirty-one is overruled.

In his thirty-second point of error appellant claims the evidence is insufficient to support a finding that there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society.

The State argues the facts of the case alone support the jury's affirmative finding that appellant poses a continuing danger to society. The State also introduced evidence of appellant's bad reputation for being peaceable and law abiding.

■ At punishment, various witnesses testified as to appellant's explosively violent nature. A seventy-two year old woman testified that about two years prior to the trial, appellant had became violently angry when she fired him for doing a poor job on her roof and had chased her with a hammer, threatening to kill her. His ex-wife testified that appellant had physically abused their two children, even striking them on the head. She testified that the children have required professional psychiatric help, and that appellant no longer has parental rights over the children. She also testified that after their separation, appellant had broken into her house and raped her. Appellant's former sister-in-law also testified as to his violence, stating that she once saw appellant beat his two children with the buckle end of a leather belt.

Additionally, appellant's acts evidence a disturbing and dangerous indifference to the taking of human life which also supports that jury's conclusion that he is a continuing danger to human society. According to his own confession, after killing the victims and disposing of their bodies, appellant returned to their home and stole two cans of tomato sauce and a package of frozen hamburger meat. After killing two people, one of them a helpless two year old, appellant planned his menu with ingredients taken from the victims' own freezer and kitchen cabinets. This evidences a callousness and lack of remorse which supports the jury's conclusion that appellant is a continuing danger. *E.g., Williams v. State,* 668 S.W.2d 692 (Tex.Crim. App.1983); *See also Wilkerson v. State,* 881 S.W.2d 321, 343 *cert. denied,* —— U.S. ——, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994) (Judge Baird dissenting) (explaining importance of lack of remorse as evidence of future dangerousness).

The atrociousness of the crime itself, the murder of a mother and her helpless child; the lack of remorse; appellant's history of committing violent acts against women, children, and the elderly; and his poor reputation for being peaceful and law-abiding, all support the jury's finding that appellant is a

7. Appellant's argument rests largely on the self-serving portions of his confession. We have already discussed that the jury was not bound to appellant's version of the facts. Indeed, the jury apparently rejected appellant's version of the offense when presented by evidence supporting an incriminating version of the offense. *See* note 6, *supra.*

continuing danger to human society. Point of error thirty-two is therefore overruled.

## II. Jury Selection

 Appellant avers in points of error one through twelve that the court erred in denying his challenges for cause to twelve potential jurors. Appellant argues that the various veniremen should have been dismissed for cause because each stated that he or she "would not consider or give any consideration to salient circumstances which are clearly mitigating circumstances." Appellant presented each of the veniremen with a catalogue of particular circumstances, asking each "whether they would consider the particular evidence to be mitigation" evidence. Appellant asserts that each of the challenged veniremen answered that he or she could not consider evidence of at least one of the following circumstances to be mitigating:

1. Severe accident causing brain damage;
2. Defendant is poor and unemployed for over two years;
3. Good disciplinary record in jail, model prisoner;
4. Never convicted of violent crime;
5. Abused sexually as a child.

Appellant does not argue that the potential jurors would not consider *any* mitigating evidence; he asserts that each of the challenged veniremen would not give weight to *specific* evidence which appellant considers to be mit-

igating.[8] Indeed, the record establishes that each of the challenged veniremen stated that he or she would be able to consider and give effect to evidence that he or she believed to be mitigating.[9] Appellant bases his argument on *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) and its progeny.

*Penry* and its progeny do not mandate that jurors *must* give mitigating weight to any particular evidence offered at punishment. The United States Supreme Court has announced only that the factfinder must not be precluded or prohibited from considering any relevant evidence offered in mitigation of the punishment and must be provided a vehicle by which to give effect to their moral determination, if any, that such evidence has a mitigating effect. Rather than mandating that certain evidence is mitigating as a matter of law, the United States Supreme Court has simply held that the sentencer must be allowed to fully consider and give effect to such evidence. *Penry,* 492 U.S. at 323, 109 S.Ct. at 2949.[10]

In *Johnson v. State,* 773 S.W.2d 322, 330–31 (Tex.Crim.App.1989), *affirmed, Johnson v. Texas,* — U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), we stated that "it is not error for a trial court to overrule a challenge for cause where it is shown that a juror will not or may not give a particular variety of 'mitigating evidence' any consideration, i.e., weight" [citing *Cuevas v. State,* 742 S.W.2d

**8.** *Compare Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (juror who will automatically vote for the death penalty in every case will fail in good faith to consider evidence of aggravating and mitigating circumstances as instructions require him to do).

**9.** Appellant cites the examination of venireman Jones as an example of the type of venireman who should have been struck for cause by the court:

Q: If he, the defendant in a case, was—had a troubled family history and there's evidence of child sexual abuse on the defendant?
A: Yes.
Q: That the defendant in this hypothetical case is poor or has been unemployed for over two years?
A: No.
Q: No to both, poor or unemployed, both of them?
A: No to both.

Q: That the mitigating evidence shows the defendant had a good disciplinary record in jail, following the rules well and was not a trouble maker and appeared to do everything that he was told to do during his period of custody while in jail?
A: No, I wouldn't consider that mitigating.
Q: Give consideration to the testimony of a *neurologist* who might testify in the case about the fact that he is not—he does not exhibit a person who would be dangerous in the future?
A: Yes.
Q: Evidence that the defendant had a paranoid trait or had some paranoid personality?
A: Yes.
Q: That the defendant has never before been convicted of a felony or even a misdemeanor in his entire life?
A: No.

**10.** *See also Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

331 (Tex.Crim.App.1987), *cert. denied,* 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988), and *Cordova v. State,* 733 S.W.2d 175 (Tex.Crim.App.1987), *cert. denied,* 487 U.S. 1240, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988) ]. Each juror must be able to consider mitigating evidence, but the weight that each juror gives to particular "mitigating" evidence is left to the individual's discretion.[11] Since there is no precedent for requiring that jurors consider certain evidence mitigating as a matter of law, the trial court did not err in overruling appellant's challenges for cause. Appellant's points one through twelve are overruled.

■ In points of error thirteen through nineteen appellant challenges the trial court's denial of his challenges for cause on grounds that certain veniremen could not distinguish between "intentional" and "deliberate." Veniremen who cannot distinguish between the terms "intentional" and "deliberate" as contemplated in Article 37.071 must be removed for cause as prejudiced against the laws upon which the appellant is entitled to rely. *Felder v. State,* 758 S.W.2d 760, 769–70 (Tex. Crim.App.1988).

■ Reviewing the voir dire examination of the seven veniremen of whom appellant complains, we find that these veniremen expressed various levels of confusion at different points of their examination. However, each ultimately stated that he or she could distinguish between "intentional" and "deliberate" and would require proof of deliberation beyond a finding that appellant acted intentionally. Since the record supports the court's decision, we cannot conclude that the trial court abused its discretion. *Martinez v. State,* 863 S.W.2d 468, 472 (Tex.Crim.App. 1993). Appellant's thirteenth through nineteenth points of error are overruled.

■ In point of error twenty appellant asserts that the trial court erred in denying

his challenge for cause to venireman Smith. Appellant challenged Smith on the ground that he was disqualified from jury service as a matter of law, under Article 35.16(a)(1).[12] Appellant argued that because Smith was not a resident of Sabine County, he was not a qualified voter of the county and therefore disqualified as a matter of law. We have reviewed Smith's voir dire examination and found that the trial court's decision was supported by the record. Smith testified that he maintained a permanent residence in Sabine County where he received his mail, that he voted in Sabine County and that he intended Sabine to be his county of permanent residence. *Hutson v. State,* 106 Tex.Crim. 278, 291 S.W. 903 (App.1927) (juror living out of county for four months was qualified as resident because he had no intention of abandoning former residence); *see also Mills v. Bartlett,* 377 S.W.2d 636, 637 (Tex.1964). Point of error twenty is overruled.

In point of error twenty-one, appellant disputes the trial court's denial of his challenge for cause against venireman Bertrand. The record reveals that appellant's counsel asked Bertrand whether she had "formed a conclusion or opinion as to the guilt or innocence of the defendant." When she answered "yes," appellant asked, "[w]ould it take evidence to remove—to overcome that conclusion that you have in your mind?" Bertrand again answered "Yes." Appellant's counsel then stated "That's statutory your Honor."

The trial judge responded to appellant's objection by stating that he agreed that if Bertrand was prejudiced, she must as a matter of law be dismissed, but that he needed to ask a few questions before determining whether she was prejudiced. The judge then specifically asked if Bertrand's preconceptions would prejudice her as a juror. She answered that they would not, stating that because of the presumption of innocence, she

---

**11.** Indeed, we have recently rejected an argument that evidence of child abuse is mitigating as a matter of law. *Clark v. State,* 881 S.W.2d 682 (Tex.Crim.App.1994).

**12.** Article 35.16(a)(1) reads:
 (a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the

jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:
 1. That he is not a qualified voter in the state and county under the Constitution and laws of the state; provided, however, the failure to register to vote shall not be a disqualification.

would have to set aside any prejudice and would require evidence beyond a reasonable doubt before finding appellant guilty. She unequivocally stated that she would be fair and impartial.

Appellant argues that it was improper for the court to question Bertrand once her answers had disqualified her as a matter of law. Appellant points to Article 35.16(a)(10), which states that a challenge for cause may be made if:

> 10. [F]rom hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. **To ascertain whether this cause of challenge exists, the juror shall first be asked whether,** in his opinion, **the conclusion so established will influence his verdict.** If he answers in the affirmative, he shall be discharged **without further interrogation by either party or the court** ...

(emphasis added).

■■■■■ Appellant's assertion that the trial court erred in questioning Bertrand would be correct if his questioning had indisputably established that Bertrand's conclusion as to his guilt or innocence would influence her verdict. However, after establishing that Bertrand held a conclusion as to his guilt or innocence, appellant abandoned the statutory language and failed to clearly establish whether that conclusion would influence her verdict.[13] Under these circumstances, it was not improper for the court to question the venireman to clarify whether her conclusion "would influence [her] in [her] action in finding a verdict." Art. 35.16(a)(10). Since appellant did not clearly establish that the con-

clusion held would influence Bertrand's verdict, the trial court was justified in clarifying the matter. Since the court's questions established that Bertrand's conclusion would not influence the verdict, there was no error in denying appellant's challenge for cause. Appellant's twenty-first point of error is overruled.

■■■ In points of error twenty-two and twenty-three, appellant argues that veniremen Butler and Bryant, respectively, were incapable of considering the full range of punishment, and thus, the trial court erred in denying his challenges for cause to these veniremen. Appellant's contentions are factually unfounded; both veniremen were rehabilitated.

In spite of efforts by appellant's co-counsel to cut off Bryant's complete answer to his question of whether she could consider probation in a murder case, it is clear from her responses that she was rehabilitated. After the law was explained to her, Bryant unequivocally stated that she could consider the full range of punishment, including probation: "If I thought," she answered, "it [probation] should be given from the evidence, I could." And, upon the State's question, Bryant responded that she could envision a situation where she not only could, but would vote for probation in a murder offense.

Venireman Butler likewise was completely rehabilitated, unequivocally stating that he could envision a murder situation where probation would be an appropriate punishment. In spite of appellant's attempts to present Butler with hypotheticals which would encourage him to retract his statement, the venireman persisted in his answer that under

13. Admittedly, the question asked by the defense,—"And based on that opinion or conclusion would it take evidence to remove, to overcome that conclusion that you have in your mind?"—implies that the conclusion would influence the venireman's verdict. However, faced with only an implication, and not a clear statement that her preconception would influence her verdict, the court was within its discretion to clarify the matter. When the venireman's answer is unclear, we will defer to the trial judge's discretion, and reverse only upon a finding of abuse of discretion. *E.g., Chambers,* 866 S.W.2d at 22. The ultimate decision to dismiss potential jurors for cause is a heavy responsibility which rests upon the trial judge; the trial court must be allowed to ask questions to clarify venireman's answers and make intelligent and informed decisions. *See also Cantu v. State,* 842 S.W.2d 667, 681 (Tex.Crim.App.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). We add, however, that article 35.16(a)(10) is very specific in its proscription of any further questioning in cases where the venireman answers affirmatively to the proposition that he holds a conclusion as to the guilt or innocence of the defendant which will influence his verdict.

certain circumstances probation would be an appropriate punishment.

 The trial court has the responsibility of discerning from the testimony as a whole, including demeanor of the venireman, whether the individual is qualified to serve on the jury. *Chambers,* 866 S.W.2d at 22. If the record supports the trial court's determination, we will not disturb that decision. We overrule appellant's twenty-second and twenty-third points of error.

 Appellant complains in point of error twenty-four that the trial court erred in overruling his objection to the State's use of factual hypotheticals in the examination of venireman Bryant. Appellant relies on *Cuevas v. State,* 742 S.W.2d 331 (Tex.Crim.App. 1987), *cert. denied,* 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988). *Cuevas* holds that while it is proper to use hypothetical fact situations to explain an application of law, it is improper to inquire how a venireman would respond to particular circumstances presented in a hypothetical question. 742 S.W.2d at 336, n. 6.[14] The State used hypotheticals to explain to Bryant various types of homicide and their corresponding punishments. This was necessary because Bryant had indicated that since all murder ends in death, she could not understand the propriety of an array of punishments for the killing of another. With the help of the State's hypotheticals, Bryant reformed her earlier assertion that she could not consider the full range of punishment. There is no error in presenting the venireman with hypotheticals which illustrate legal concepts. *Id.* Point of error twenty-four is overruled.

### III. Pretrial Motions

In point of error twenty-five appellant claims the trial court erred in denying his motion for continuance. Appellant argues that he had inadequate time to prepare for trial. Specifically, he argues the following: defense counsel is a solo practitioner and had only forty-three days to prepare before the beginning of voir dire; the State included

over eighty-seven potential witnesses on its witness list, including fourteen names added only two weeks before trial was set to begin; the State listed over one hundred potential exhibits, ninety-five of which were actually introduced; and counsel could not adequately review medical records which contained potential mitigating evidence. In the affidavit attached to the original motion for continuance, the investigator working with defense counsel indicated that he had not yet had time to report back adequately to counsel on his interviews with the State's witnesses.

 Where denial of a continuance has resulted in representation by counsel who was not prepared, we have not hesitated to declare an abuse of discretion. *Rosales v. State,* 841 S.W.2d 368, 372 (Tex.Crim.App. 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). Nevertheless, the granting or denial of a motion for continuance is within the sound discretion of the trial court. *Cooks v. State,* 844 S.W.2d 697, 725 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993); Art. 29.03 (criminal action *may* be continued upon sufficient cause shown in motion); Art. 29.06(6) (sufficiency of a motion for continuance shall be addressed to "sound discretion" of court and "shall not be granted as matter of right"). To find an abuse of discretion in refusing to grant a motion for continuance, there must be a showing that the defendant was prejudiced by his counsel's inadequate preparation time. *Duhamel v. State,* 717 S.W.2d 80, 83 (Tex.Crim.App. 1986) (citing *Hernandez v. State,* 643 S.W.2d 397, 399–400 (Tex.Crim.App.1983) and *Sanne v. State* 609 S.W.2d 762, 776 (Tex.Crim.App. 1980)), *cert. denied,* 480 U.S. 926, 107 S.Ct. 1387, 94 L.Ed.2d 701 (1986).

 Appellant's counsel contends that the denial of the continuance rendered him unable to prepare an adequate defense; however, he does not argue, must less establish, any specific prejudice to his cause arising from the trial court's failure to continue the trial. In *Hernandez* appointed counsel had

---

**14.** *White v. State,* 629 S.W.2d 701, 706 (Tex. Crim.App.1981), *cert. denied,* 456 U.S. 938, 102

S.Ct. 1995, 72 L.Ed.2d 457 (1982).

less time than appellant to prepare for trial, but we, nevertheless, held:

> Although this is a relatively short time for preparation in a [capital murder trial], no specific, serious matter has been raised by the appellant and the record does not otherwise show that the appellant's defense was prejudiced by counsel not having more time to prepare for trial.

643 S.W.2d at 399–400. Like Hernandez, appellant does not allege any specific prejudice to his defense. He does not allege that he was unfairly surprised at trial or unable to effectively cross-examine any of the State's witnesses. The bare assertion that counsel did not have adequate time to interview the State's potential witnesses does not alone establish prejudice. *Cooks,* 844 S.W.2d at 725. The assertion that counsel did not have time to adequately investigate medical records for potential mitigating evidence without any showing of harm likewise fails to establish an abuse of discretion. *Duhamel,* 717 S.W.2d at 83. Absent a showing of prejudice, we can not hold that the trial court abused its discretion in overruling appellant's motion for continuance. Appellant's twenty-fifth point of error is overruled.

### IV. Trial

Appellant avers in point of error twenty-six that the trial court erred in admitting his written confession over objection. Appellant asserts that while in custody on June 28, 1991, he gave law enforcement officers an oral statement which was recorded, and a written transcript of the audio recording was provided for appellant's signature and introduced at trial against him. Appellant asserted that because the audio recording did not contain the warnings required by Article 38.22(3)(a)(2), the transcription of that statement, even though it does contain the required written warning, is infirm and should have been suppressed. The State asserts that since the audio recording was not offered as evidence, the warning requirements under Article 38.22(3)(a)(2) are inapplicable and irrelevant.

We note that there are no allegations of involuntariness, or coercion, or of lack of warnings regarding either the original recorded statement or the signing of the transcribed statement; appellant alleges merely that the recording did not comply with statutory requirements. Under these facts, we agree with the State that the transcription of the oral statement stands on its own. As long as the confession is voluntary, law officers are currently permitted to reduce defendants' oral statements into writing; they are even allowed to paraphrase the statements. *E.g., Bell v. State,* 724 S.W.2d 780, 793 (Tex.Crim.App.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). And as long as the warnings appear on the written statement, it is admissible.[15] The trial court did not err in allowing appellant's written statement into evidence. Appellant's twenty-sixth point of error is overruled.

In points of error twenty-seven and twenty-eight appellant alleges that Section 19.03 of the Texas Penal Code is unconstitutional and that the trial court erred in failing to instruct the jury that appellant could be found guilty of murder for each of the victims instead of capital murder for both. Appellant cites no authority in support of his proposition, nor does he provide any argument beyond his conclusory assertion. From appellant's brief, we cannot discern his specific arguments, and we will not brief appellant's case for him. Appellant's points of error are multifarious and inadequately briefed. *State v. Gonzalez,* 855 S.W.2d 692, 697 (Tex.Crim. App.1993); *Goodwin v. State,* 799 S.W.2d 719, 723, n. 1 (Tex.Crim.App.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2913, 115 L.Ed.2d 1076 (1991). Therefore, his twenty-seventh and twenty-eighth points of error are overruled.

In his thirty-third point of error, appellant asserts that the trial court erred in denying his requested instruction on the issue of mitigating circumstances. He claims this error precluded the jury from exercising its "rea-

---

**15.** Appellant does not contend that the written confession fails to incorporate the required warnings.

soned moral response" to any mitigating evidence, as required by *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

The trial court submitted the following instruction:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal responsibility at the time you answer the Special Issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, rather than a death sentence, is an appropriate response to the personal responsibility of the defendant, you are instructed to answer the special issue under consideration "No".

In *Fuller v. State,* 829 S.W.2d 191 (Tex. Crim.App.1992), this Court held that such an instruction is "adequate to avoid the constitu-

tional infirmity condemned by *Penry.*" Point of error thirty-three is overruled.

The judgment of the trial court is affirmed.

OVERSTREET, J., concurs in the result.

CLINTON, J., dissents.

MALONEY, Judge, concurring.

In his thirty-second point of error appellant claims the evidence is insufficient to support a finding that there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. I agree that the evidence is sufficient to support an affirmative finding on the second issue, but write separately to emphasize exactly what evidence supports that finding and also to caution that we should not lose sight on the confines of *Furman* and *Jurek* when analyzing sufficiency of the evidence on punishment issues.

I.

Although the majority takes pains to avoid saying so, an affirmative finding on the second issue rests virtually on the fact that the offense was a double murder of mother and child by strangulation. The evidence apart from the facts of the offense itself is largely insignificant.

The State offered the following evidence of extraneous unadjudicated misconduct: [1]

---

1. Notably, the State offered no evidence of prior conduct that resulted in criminal prosecution or psychiatric testimony that appellant would be a continuing threat to society.

 Appellant offered the following evidence on his behalf at punishment:

 1. Appellant's father testified that appellant had a good relationship with the children from his first marriage, as well as with the children from his current marriage. He testified that he had never seen appellant "as much as spank" his children. He further testified that appellant's divorce from his first wife was difficult. He stated that during their separation and for two years following the divorce appellant exercised his visitation rights up until one day when he went to pick his children up and was informed by the new occupants of the house that his ex-wife and children had moved away. He also testified that since sustaining a head injury in a car accident in 1975, appellant has had spells where he "couldn't cope" and became easily frustrated. He testified that

 appellant would often withdraw and need to be left alone in order to "cope." He also testified that he had never seen appellant become violent and that appellant had a good reputation for being peaceable and law abiding.

 2. Appellant's current wife testified to appellant's peaceable nature and good relationship with her and their children.

 3. Appellant's 11 year old daughter testified that appellant was a good father, that he had never beaten or abused her or her siblings and that she loved him.

 4. A former employer testified that appellant was a good worker and had never shown any anger or violence at work. A business associate testified that in his dealings with appellant, appellant had never displayed any violence or anger.

 5. Four dispatcher/jailers testified that appellant had been a model prisoner.

 6. Appellant's sister testified that she and appellant were sexually abused as children by their older sister.

1. A 72 year old woman testified that approximately two and one half years prior to the trial she had hired appellant to trim her trees, a dispute arose from problems associated with the job and she hired someone else. She said that upon learning of the new hire, appellant became angry, chased her with a hammer he was about to use to fix her roof and threatened to kill her.

2. Appellant's ex-wife testified that she was married to appellant from 1970–77, but had not been in contact with him since then. She testified that he beat their two children with a belt and that one time she came home and found the older child with bruises on his head. She also testified that the children have required professional psychiatric help and that one tried to commit suicide. Appellant no longer has parental rights over the children and they have been adopted by her current husband. She also testified that while she and appellant were separated before their divorce, he broke into her house and raped her.

3. Appellant's former sister-in-law testified that she once saw appellant beat his two children with the buckle end of a leather belt.

The misconduct involving appellant's ex-wife and children from his first marriage occurred fifteen to twenty years prior to the trial of this case. The passage of time since these events allegedly took place and the fact that none of them resulted in criminal charges weakens their evidentiary value. There is a noticeable dearth of evidence of violent conduct by appellant during a thirteen year period, from the alleged incidents with his ex-wife and children until the alleged incident involving the seventy-two year old woman two-and-one-half years prior to the instant offense.

The evidence of lack of remorse consists solely of appellant's taking of the hamburger meat and tomato sauce. The testimony of one police officer that appellant's reputation was bad is hardly overwhelming.

Apart from evidence of misconduct that occurred nearly twenty years ago and a single recent account of verbal threats arising from a dispute related to a job, we are left with a defendant who has never been charged with a crime, and a motiveless,[2] non-premeditated killing of two victims, the details of which are virtually unknown. What the majority is unwilling to make clear in its opinion is that the facts of this case alone— the strangulation of a mother and child— support an affirmative finding by a rational trier of fact that appellant would constitute a continuing threat to society. The strangulation of a mother and child is so shockingly disturbing as to alone support a finding by a rational trier of fact that the individual responsible is depraved to the point of constituting a continuing threat to society. The majority's emphasis on other evidence in support of the second issue is disingenuous. As mentioned previously, the misconduct involving appellant's wife and children from his first marriage occurred fifteen to twenty years prior to the trial of this case. Thirteen years passed between the time of those alleged incidents and the alleged incident involving the seventy-two year old woman. None of this evidence resulted in criminal prosecution.

7. A neuropsychologist who examined appellant testified that appellant had mild to moderate frontal lobe pathology, probably due to the brain injury sustained in 1975. He testified that this impairment affects mood and abstract thinking. He also called the condition "organic mood disorder or organic affective disorder." He testified that such impairment might tend to degenerate or worsen with age. He also testified that such impairment, being organic in nature, could be treated with medication.
In addition, evidence which could be viewed as mitigating or aggravating included the testimony of the State's psychiatrist that a head injury can in some cases result in behavioral changes such that the injured person might be more irritable or short tempered. The State's psychiatrist also testified that if appellant had suffered amnesia, it would be psychogenic amnesia rather than organic. He testified that, given his limited examination of appellant, he was unable to conclusively rule out that appellant had suffered from psychogenic amnesia.

2. The majority's suggestion that appellant was in the victims' house on the morning of the offense and was surprised by their return has no basis in evidence.

## II.

In reviewing sufficiency of the evidence on punishment issues in capital cases, this Court must remain mindful of *Furman v. Georgia,* 408 U.S. 238, 239–40, 92 S.Ct. 2726, 2727, 33 L.Ed.2d 346 (1972) and its aftermath. In *Furman,* in a per curiam opinion, the Supreme Court struck down the death penalty sentencing schemes in Texas and Georgia, concluding that "the imposition and carrying out" of those schemes constituted cruel and unusual punishment. In four separate concurring opinions, Justices Douglas, Brennan, Stewart and Marshall all discussed, to varying degrees, the arbitrary manner in which the death sentence was imposed under systems in which juries acted with virtually unfettered discretion.[3] Thereafter, the Texas death penalty scheme was amended by the Legislature to more narrowly identify the offenses implicating the death penalty and focus the jury's decisionmaking process at sentencing. The Supreme Court upheld the constitutionality of the new scheme primarily for three reasons:

By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first degree murder case before a death sentence can even be considered. By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly"

or "freakishly" imposed, it does not violate the Constitution.

*Jurek v. Texas,* 428 U.S. 262, 275, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976).

Accordingly, not every capital murder calls for the imposition of the death penalty; it may be imposed only upon a narrow factfinding by the jury who answers yes to two or three specific questions. This Court emphasized in *Keeton v. State,* 724 S.W.2d 58, 64 (Tex.Crim.App.1987),

. . . we are bound by the law to make certain that the death penalty is not "wantonly or freakishly" imposed, and that the purposes of the jury's consideration of the [ ] special issues . . . are accomplished. Every murder committed in the course of robbery is in some way cold-blooded and senseless. Each such murder does not, however, merit the death penalty, our most final punishment.

It is against this historical backdrop that we should review sufficiency of the evidence on the special issues, keeping in mind that the Legislature has narrowly defined the circumstances under which a defendant is death-worthy. For this reason, a defendant is not automatically sentenced to death upon a conviction of capital murder. The State is still required to prove the special issues beyond a reasonable doubt, separate and in addition to proving the defendant's guilt.

I pause to revisit *Furman* and *Jurek* in this case because the facts which support an affirmative finding on the first and second issues here are intricately bound with the simple fact that this was a double murder case. We would surely run afoul of *Furman* and *Jurek* to suggest that every double murder under Tex.Penal Code Ann. § 19.03(a)(6)(A) necessarily warrants an affirmative finding on the two special issues. I emphasize, however, the existence of evidence in this case which renders appellant

---

3. Justice Douglas emphasized that it is indeed cruel and unusual punishment to apply the death penalty arbitrarily or discriminatorily. He further reasoned that a system which "leaves to the uncontrolled discretion of judges or juries the determination whether defendants committing these crimes should die or be imprisoned[,]" enables the death penalty to be selectively applied, contrary to our notions of equal protection

of the law and to the cruel and unusual punishment clause of the eighth amendment. *Id.* at 253, 92 S.Ct. at 2733 (Douglas, J., concurring). Justice Brennan recognized that "rather than resulting in the selection of 'extreme' cases" for the death penalty, the existing schemes fostered an arbitrary imposition, which he viewed as "wanton and freakish." *Id.* at 294–95, 310, 92 S.Ct. at 2754–55, 2762 (Brennan, J., concurring).

deathworthy beyond the fact that he killed two persons in a single criminal transaction; specifically, the manner of death by strangulation, the proof that appellant killed by touching them and not letting go until each was dead. Considering that one of the deceased was a child is even more telling. Based upon these facts, I agree that a rational jury could find that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

With these comments, emphasizing that this is one of those close cases in which we should be especially cognizant of the confines of *Furman* and *Jurek*, I join the opinion of the majority.

BAIRD, Judge, dissenting.

Believing the trial judge erred in denying appellant's motion for continuance, I respectfully dissent.

## I.

A brief review of the procedural facts is necessary to put appellant's twenty-fifth point of error in proper context. The instant capital murder prosecution is notable for the pace at which it proceeded through the adjudicatory process: from indictment to trial on the merits in only three months. Appellant was indicted for capital murder on July 16, 1991. An attorney was appointed approximately two weeks later on July 29. On September 9, the trial judge granted appellant's motion for discovery of witnesses and evidence. Eleven days later, on September 20, the State submitted to appellant a list of 76 potential witnesses. Shortly thereafter, the State supplemented the list, raising the number of potential witnesses to 87. Additionally, the State tendered or made available for inspection more than 100 items of evidence.

On October 14, appellant filed a motion requesting a two month continuance in order to interview the State's witnesses and review the evidence. On October 21, immediately prior to the commencement of voir dire, the motion was heard. Appellant's counsel, a solo practitioner, explained that he was not ready to proceed to trial because he and his

investigator had not had sufficient time to interview all the State's potential witnesses. In opposing appellant's motion, the prosecutor explained that he had informed appellant's investigator of the probable witnesses and of the general subject matter of their testimony. The trial judge denied appellant's motion, stating that appellant's investigator could interview the State's witnesses while appellant's counsel conducted voir dire.

Appellant now contends the trial judge erred in denying the motion for continuance because counsel had insufficient time in which to prepare for trial. The majority holds there was no abuse of discretion because appellant has failed to show specific prejudice from the denial of the motion. *Ante*, 906 S.W.2d 500, 512. However, because of the complexity of the case and the gravity of the offense, I believe prejudice should be presumed.

## II.

The Sixth Amendment guarantees the right to the *effective* assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But that right is "rendered meaningless if a defendant is forced to trial in the absence of adequate time to prepare." *United States v. Rojas–Contreras*, 474 U.S. 231, 240, 106 S.Ct. 555, 560, 88 L.Ed.2d 537 (1985) (Blackmun, J., concurring). In *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), the United States Supreme Court warned that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id.*, 376 U.S. at 589, 84 S.Ct. at 849. Similarly, in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Court stated:

> ... The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, *must not be stripped of his right to have sufficient time to* advise with counsel and *prepare his defense*. To do that is not to proceed promptly in the calm spirit of regulated

justice but to go forward with the haste of the mob.[1]

*Id.,* 287 U.S. at 59, 53 S.Ct. at 60. Accordingly, "[i]t is fundamental than an attorney must have a *firm command of the facts* of the case as well as the law before he can render reasonably effective assistance of counsel." *Ex parte Lilly,* 656 S.W.2d 490, 493 (Tex.Cr.App.1983). *See also, Ex parte Ybarra,* 629 S.W.2d 943, 946 (Tex.Cr.App. 1982); *Ex parte Duffy,* 607 S.W.2d 507, 516 (Tex.Cr.App.1980); *and, Flores v. State,* 576 S.W.2d 632, 634 (Tex.Cr.App.1978). Consequently, an attorney must not only have a reasonable opportunity to investigate the facts of his client's case, *Butler v. State,* 716 S.W.2d 48, 54 (Tex.Cr.App.1986), but must also be afforded a reasonably sufficient amount of time to review those facts and determine how they relate to a potential defense. To deny an attorney reasonable time in which to review the results of his investigation endangers the effective assistance of counsel because it prevents him from effectively "present[ing] all available testimony and other evidence to support the defense of his client." *Ybarra,* 629 S.W.2d at 948.

Although the decision to grant a continuance under Tex.Code Crim.Proc.Ann. art. 29.03 lies within the discretion of the trial judge, *Cooks v. State,* 844 S.W.2d 697, 725 (Tex.Cr.App.1992); *and, Collier v. Poe,* 732 S.W.2d 332, 334 (Tex.Cr.App.1987), "[w]here denial of a continuance has resulted in representation by counsel who was not prepared ... this Court has not hesitated to declare an abuse of discretion." *Rosales v. State,* 841 S.W.2d 368, 372 (Tex.Cr.App.1992). In reviewing whether a trial judge has abused his discretion, an appellate court must determine if the "trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Cr. App.1992); *Kelly v. State,* 824 S.W.2d 568, 574 (Tex.Cr.App.1992); *and, Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Cr.App.1990) (Op. on reh'g). In spite of the deference granted to a trial judge under an abuse of discretion standard, an appellate court's re-

view must not devolve into a rote exercise. The abuse of discretion standard does not require a court to examine the trial judge's decision in a vacuum. Rather, the answer to whether a trial judge has abused his discretion in denying a motion for continuance "must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar,* 376 U.S. at 589, 84 S.Ct. at 850. Thus, where the circumstances indicate that the trial judge's decision is beyond the "zone of reasonable disagreement," an appellate court should not hesitate to find an abuse of discretion. Some of the factors to be considered in determining whether a trial judge has abused his discretion in denying a motion for continuance include: the severity of the offense and gravity of the punishment, the length of time in which counsel had to prepare for trial, the complexity of the case and the number of witnesses, the length of additional time requested, and the inconvenience to the opposing parties and trial judge resulting from a continuance. *See generally, Ex Parte Windham,* 634 S.W.2d 718, 720 (Tex.Cr.App.1982).

### III.

In the instant case, the majority purports to review the trial judge's decision for an abuse of discretion but ignores the aforementioned factors which determine the reasonableness of that decision.

First, this was a capital case and was, therefore, qualitatively different from all other offenses for which appellant could have been charged. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Because of this qualitative difference, there is a heightened need for reliability in the determination that death is the appropriate punishment. *Ibid.* Consequently, in capital cases, it is fundamental that appellant's counsel have sufficient time in which to interview witnesses, acquaint himself with the facts and prepare an adequate defense. *Ybarra,* 629 S.W.2d at 946.

The question of whether the trial judge abused his discretion in denying the motion

1. All emphasis is supplied by author unless otherwise noted.

for continuance also necessitates an examination of the circumstances confronting appellant's counsel. *Ungar, supra; and, Windham, supra.* The record reflects that appellant was represented by a solo practitioner who had been appointed less than three months prior to the time voir dire began. From the date the State disclosed its potential witnesses and made available its evidence, appellant's counsel had 32 days to interview the State's 87 potential witnesses and to review more than 100 items of evidence. Of course, during this time, counsel also had the obligation to seek out and interview his own witnesses. *Duffy,* 607 S.W.2d at 517. In denying appellant's motion for continuance, the trial judge explained that appellant's investigator could continue interviewing potential witnesses during voir dire. But we have emphasized that counsel's duty to investigate and interview witnesses "may not be sloughed off to an investigator if one is appointed. It is counsel's responsibility." *Flores,* 576 S.W.2d at 634. *See also, Butler,* 716 S.W.2d at 55.

Moreover, this was a complex case: the record reflects much of the State's case rested on scientific testimony, including medical and dental records, as well as detailed forensic analysis, which was necessary to prove the identity of the victims and their causes of death. In light of this considerable burden, appellant requested a two month continuance. Had appellant's motion been granted, the prosecution still would have proceeded within six months from the date of indictment.

Finally, it is notable that appellant presented his motion one week prior to the commencement of voir dire. Consequently, the State and trial judge had notice of appellant's need for additional time and would not have been subject to the inconvenience of granting a continuance during voir dire or after trial on the merits commenced. Under these circumstances, there is no indication that a two month continuance would have inconvenienced the State or the trial judge.

When reviewed in the appropriate light, no reasonable person could conclude the trial judge's denial of appellant's motion for con-

tinuance was reasonable. Accordingly, I respectfully dissent.