

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-06-00242-CR

_____

BYRON TRENT BAYER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court No. 23,233

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

Byron Trent Bayer was convicted by a jury of capital murder for killing his mother, Patsy

Bayer, while in the process of stealing her ATM card and her automobile.  The State waived the

death penalty and Byron[1] was automatically sentenced to life imprisonment.

Patsy's body was found in her home in Greenville after she had been dead for several days.

She had been strangled with an extension cord.  Her vehicle, a Chevrolet Tahoe, was missing, as was

her ATM card.  Byron's car, a Geo, was in the driveway.

On appeal, Byron argues that the evidence is legally and factually insufficient to support a

finding of guilt.  Specifically, he alleges that the evidence is conflicting about the length of time that

Patsy had been dead before being discovered and, according to his theory, he was in Dallas at the

time of her murder.  Byron also asserts that there was evidence Patsy had given him money and the

use of her Tahoe on other occasions and that his use of the Tahoe and ATM card does not show he

committed robbery.  We overrule the points of error and affirm the judgment of the trial court.

I.      Review of the Evidence

A.      Sequence of Events

The time of death is primarily based on expert testimony and testimony about the last time

that Patsy had been seen.  When her body was found, it had begun to decompose.  One expert opined

that Patsy had been dead about forty-eight hours—which would have placed her death at a time while

---

[1]Due to the fact that several people have the same last name, we refer to them by their first
names in this opinion to avoid confusion.

Byron was in Dallas—and another expert testified that Patsy had been dead four days, which would place her time of death at approximately the time when Byron went to her home and left in Patsy's Tahoe.

Time line:

| | |
|---|---|
| October 4, 2004 | Last known contact with Patsy, before 11:00 a.m. |
| October 4, 2004 | Byron takes Tahoe and Patsy's debit card |
| October 4, 2004 | Debit card used in Quitman, Greenville, and Commerce |
| October 5, 2004 | Debit card used in Greenville at 2:13 a.m. and in Caddo Mills at 5:14 a.m. |
| October 6, 2004 | Debit card used in Greenville twice ($200.00 each time) and at Exxon station (Byron's use was also confirmed by video of the transaction) |
| October 7, 2004 | Debit card used in Dallas ($401.50), and for three small transactions in Dallas |
| October 8, 2004 | Debit card used in Dallas to pay for a room at the Drury Inn and twice at ATMs to obtain approximately another $400.00 in cash |
| October 8, 2004 | Body found |
| October 9, 2004 | Byron arrested |

### B. Lay Witnesses

Christy Childers testified that she spoke with Patsy before 11:00 a.m. on Monday, October 4, 2004. Broderick Henderson testified that, on October 4, Byron picked him up and they began "smoking dope" (crack cocaine). Byron told Henderson that he could get an ATM card and another vehicle. Henderson went with Byron to a "rich neighborhood" and Byron told him to get into "my

3

other car" (the Tahoe). Byron went into the residence and later returned "kind of half sweaty" and wearing a different shirt. Byron told Henderson that he had helped his mother move furniture. Henderson further testified that Byron obtained cash at a service station and bought drugs that they used together and finally that Byron dropped Henderson off in Commerce. Byron asserts that Henderson is a convicted felon and was using drugs during the relevant time period and that his testimony is unworthy of belief.

Shirley Anderson testified that she, Mary Henley, and Kerry Miller went to Dallas with Byron to party and that they were all "scoring drugs." She also explained the withdrawal of funds by Byron using a debit card, Byron's purchases of drugs, and their partying at motels in Dallas. Henley also testified that Byron told her he had stolen his mother's credit card and her vehicle. They left Dallas and returned to Greenville, where Byron was arrested October 9 at the Dream Lodge Motel. At that time, the Tahoe and Patsy's debit card were in Byron's possession. There is no dispute that Byron used Patsy's Tahoe and debit card at or about the time of her death or that Henderson was in the Tahoe. Several days of Patsy's mail was in her mailbox when her body was found.

Patsy had been seriously injured in an automobile accident and recovered approximately $400,000.00 for her damages. At trial, some question was cast toward Byron's sister, Kim, based on testimony that his sister and mother had an unpleasant and confrontational relationship that degenerated from time to time into obscenity-laced name-calling. Other evidence showed that Kim

had been upset about money Patsy gave her—with the implication that Kim thought Patsy did not give her enough, especially since Patsy had received such a large settlement.

The evidence also shows that Byron had not lived at home for some time, but moved back into his mother's home about a month before her murder. Patsy's friend and housekeeper, Roma Jean Camacho, testified that Patsy was uncomfortable with that situation and that Patsy was afraid Byron would rob her, but that Byron had told Patsy that he was dying of cancer. There was also evidence that, at the time of her death, Patsy was planning to immediately tell him to move out.

### C.    Expert Witnesses

This case also has an unusual amount of scientific evidence presented, and dueling experts as to the meaning of parts of it. A number of DNA tests were run on various items found in the residence and presented to the jury. The State's DNA expert testified that Byron's DNA was found on a beer bottle in the living room, and on one on the back patio; that a mixture of Byron's and Patsy's DNA was found on a bloodstain on a doorknob leading from the kitchen to the garage; and that Byron's DNA was also found on a tan shirt that Henderson testified Byron had worn into—but not back out of—the residence, and the shirt also had Patsy's blood on its sleeves.

Byron counters none of that evidence, but suggests alternative reasons for each. He was living in the home; thus, the fact that his DNA was there is not particularly probative. The mixture of his and Patsy's DNA on the doorknob would also be of little importance—except that it was found in a bloodstain on the doorknob. Byron has no explanation for the change of the shirt, except to

5

point out that Henderson is a long-time heavy and continual user of drugs, who admits that his memory is erratic. He also suggests that the type of murder (strangulation) is not a bloody act[2] and that the blood on his shirt may have been placed on the shirt by another person after the decomposition had reached the point that Patsy began exuding fluids with some mixture of blood components. That is the consistent explanation for the obvious fluid tracks on the victim as shown by the crime scene photographs.

Dr. Joni McClain, a deputy chief medical examiner for Dallas County, performed the autopsy. She testified about the cause of death and the possible time of death. She also testified that rigor mortis had ended, which she testified placed death at least two or three days out when there was no rigidity remaining. She further testified that there were no insects on the body at the time of the autopsy, but that there was a fly and some pupa cases in her clothing. The condition of the body was consistent with her having been dead four days because of the degree of decomposition of the body, focusing on the fact that it was not possible to draw any vitreous (fluid) from the eye. She testified that, as a general rule, after about four days you could no longer collect any fluid.

On cross-examination, McClain acknowledged that the rate of decomposition could change based on the temperature of the environment and that she did not know what that situation was in this case. She nevertheless stood by her conclusion, based on her experience, that Patsy had been dead for at least four days or longer.

---

[2]There is also expert testimony to that effect from Max Courtney, a Baylor University professor.

Dr. Jeffery Tomberlin testified as an expert for Byron. He is an entomologist, and opined he believed that, since there was no insect activity on the victim, and since there was no apparent insect activity in a bowl of cereal sitting on a dresser in the bedroom where Patsy's body was found, this was inconsistent with the victim being dead for over four days. He testified that, even with sealed rooms and windows, you would expect to see insect activity.

Dr. Sridhar Natarajan, a forensic examiner who was previously the chief medical examiner for Lubbock County, agreed with the cause of death explained by McClain, but disagreed with her conclusion that the victim had been dead for four days when discovered. He believed that the victim had been dead at least two days—but the lack of vitreous humor in the eyes that McClain used as a marker for time did not necessarily show that Patsy had been dead for four days. Natarajan also pointed out the differences in Patsy's appearance between the crime scene photographs and the autopsy photographs to show how much decomposition had occurred during the twenty hours between her discovery and the autopsy. Natarajan concluded that the state of the victim was consistent with just over forty-eight hours after death, and he also testified that he was surprised there was no maggot or bug activity if Patsy had indeed been dead for four days.

## II.    Standard of Review

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the

7

essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). In a factual sufficiency review, we are to afford "due deference" to a jury's determinations. *Marshall*, 210 S.W.3d at 625.

As explained by the Texas Court of Criminal Appeals, the difference between the two standards is that the former requires the reviewing court to defer to the jury's credibility and weight determinations while the latter permits the reviewing court to substitute its judgment for the jury's on these questions, "albeit to a very limited degree." *Id.*

There was evidence before the jury that Byron went into Patsy's residence on October 4, while Henderson waited in Patsy's Tahoe—and that Byron came back out forty-five minutes later, sweaty and in a different shirt, and with the keys to Patsy's Tahoe and her ATM card. The physical evidence showed Byron's presence in the residence, and a shirt of the type that he had worn when he went into the residence was found lying on a chair—and both his DNA and his mother's blood was on the shirt. There was evidence that Byron then went on a four-day drug party with her vehicle and her money.

8

Some evidence showed that Byron's sister Kim had both a nonexistent relationship with him and a bad relationship with their mother. There is also evidence that Kim got along poorly with her oldest son, who her mother had taken in and provided for.

Patsy had provided monetary gifts for her children and at least some grandchildren, and there is evidence that could be understood to show that both of her children had an inappropriate interest in obtaining money from her accident settlement.

There is evidence showing that no person spoke with Patsy after October 4 and that she had several days of mail in her mailbox. The evidence about the time of death is conflicting. One expert opined that Patsy had been dead for at least four days, while another opined that the range was lower, and about two days was more likely correct. Both experts have impressive credentials, and explanations for their conclusions.

We also recognize that, because the jury is the sole judge of the weight and credibility of the witnesses, it may accept or reject any or all testimony of any witness. *See Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). Again, our role is not to "find" facts; rather, it is to see if we can determine that the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and unjust. *See Marshall*, 210 S.W.3d at 625; *Clewis*, 922 S.W.2d at 135. Byron points out that some of the lay witnesses had criminal convictions and were using drugs. These areas of impeachment were developed for the jury to consider. The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony, and reconciliation of

9

conflicts in the evidence is within the exclusive province of the jury. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). It is axiomatic that in so doing, the jury may choose to believe some testimony and disbelieve other testimony. *Id.*

In this case, evidence placed Byron at the location and in the company of the deceased, at a time within the range of time during which she was murdered. There was evidence that no one else had seen or talked to Patsy since that date and that Byron admitted to another that he took items belonging to Patsy. There is evidence that she mistrusted him, indeed, that she feared him, and that she was planning to remove him from her home. As discussed above, there was some contrary evidence—and some inferences that could have been drawn to reach a different result from the evidence presented.

As in many murder cases, the proof of the murder, as outlined in the foregoing discussion, is based on circumstantial evidence. Circumstantial evidence is as probative as direct evidence in establishing the guilt of the defendant and is sufficient alone to establish guilt. It is reviewed on appeal by the same standard as direct evidence. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

We find that a rational jury could have concluded, based on the evidence presented, that all elements of capital murder were proved beyond a reasonable doubt. Further, we do not find from this record that the jury's decision was either against the great weight and preponderance of the evidence or that it was based on inherently unbelievable evidence. The jury was confronted with

10

evidence that was not entirely consistent, and it chose which evidence to believe. Under these facts, we must conclude that the evidence is both legally and factually sufficient to support the verdict.

We affirm the judgment.


Jack Carter
Justice


Date Submitted:     February 1, 2008
Date Decided:       February 28, 2008

Do Not Publish