

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NOS. **2-07-108-CR**
**2-07-109-CR**
**2-07-110-CR**

JONATHAN PRICE LARSEN, II                    APPELLANT

V.

THE STATE OF TEXAS                                STATE

------------

FROM THE 415TH DISTRICT COURT OF PARKER COUNTY

------------

## MEMORANDUM OPINION[1]

------------

In three points, Jonathan Price Larsen, II appeals his convictions and sentences for intoxication assault, for failure to stop and render aid, and for evading arrest or detention with a vehicle. We affirm.

---

[1] *See* TEX. R. APP. P. 47.4.

## I. Factual and Procedural Background

On March 16, 2006, Larsen had a dispute over a movie ticket with the assistant manager of a movie theater in Hudson Oaks, Texas. The assistant manager called the Hudson Oaks Police Department (HOPD), and, according to her testimony, when HOPD officers approached Larsen's vehicle, Larsen "pulled out and took off."[2]

The HOPD officers activated their vehicles' lights and sirens and chased Larsen's vehicle as he traveled on I-20 toward Weatherford at around 100 miles per hour. Still following Larsen, the HOPD officers exited I-20 but then lost sight of Larsen's vehicle. When they reached the intersection of Bankhead Road and U.S. Highway 180, they found a severely damaged Weatherford police vehicle and Larsen's smoking vehicle.

Weatherford Police Officer Gregory Stewart had been dispatched to lay down "spike strips" in an attempt to end the car chase, and Larsen's vehicle, a heavy pickup truck, had collided with Officer Stewart's vehicle in the intersection, slamming into the driver's side door. Officer Stewart suffered two pelvic fractures, a bruised spinal cord, a severe concussion, and nerve damage,

---

[2] Larsen testified that he never saw the HOPD officers at the movie theater but that, after he left, one of his friends called him and told him "that the cops had just pulled out and that they were coming to get [him]."

as well as cuts, scrapes, and pieces of glass embedded in his scalp, all resulting in a permanent impairment rating of twenty-five percent.

Before the HOPD officers arrived, Larsen fled the scene on foot without giving aid to Officer Stewart. Shortly thereafter, Weatherford police located Larsen, who was hiding in the back of a pickup truck at a local car dealership, and arrested him. Lab analyses of two blood samples taken from Larsen that night revealed blood alcohol concentrations of .10 and .11.[3]

Larsen was indicted for intoxication assault, failure to stop and render aid (FSRA), and evading arrest or detention with a vehicle. On January 25, 2007, he pleaded guilty to all three offenses and elected to have a jury assess punishment.

The trial court set the jury trial for February 26, 2007. Larsen filed motions for continuance in all three causes on February 22, urging two grounds: (1) he needed additional time to have a second meeting with his retained mitigation expert before the expert testified at trial, and (2) he needed additional time to prepare for some of the State's witnesses, identified "within the last week that it intends to call to testify at the trial in this matter." The

---

[3] A blood alcohol concentration of .08 or more is legal intoxication. *See* TEX. PENAL CODE ANN. § 49.01(2)(B) (Vernon 2003).

3

trial court denied Larsen's motions after a hearing on February 23. Voir dire began on February 26, and Larsen's punishment trial began on February 27.

During the punishment trial, Officer Stewart and others testified about the events of March 16, 2006, and the State presented evidence of Larsen's criminal history, extraneous offenses, and other bad acts.[4] Larsen, testifying on his own behalf, admitted that on the day that his vehicle collided with Officer Stewart's vehicle, he had consumed "five or six [c]rown and cokes" and a six-pack of beer on the way home from work. When asked by the State whether he was "taking responsibility for the evading and failure to stop and render aid and getting drunk and nearly killing the officer," Larsen replied, "Yes, sir, that is correct."

During his direct testimony, Larsen admitted to his criminal history, extraneous offenses, and other bad acts, and offered as explanations his unstable family life, including watching his mother die in a car accident and an uncle who sexually abused him, and alcohol abuse. He called several friends and family members as character witnesses and Dr. Emily A. Fallis, a forensic evaluation psychologist, as his mitigation expert.

---

[4] These included writing hot checks, stealing a wallet and fraudulently using a credit card from that wallet to get his eyebrows waxed, starting a fire in a jail cell after a prior arrest, other theft incidents, and driving while intoxicated.

4

On March 2, before jury deliberations began, Larsen filed motions for a mistrial in all three causes due to juror misconduct and requested permission to take juror Catherine Boyd on voir dire to clarify a note that she had sent to the trial court. The trial court denied Larsen's voir dire request and Larsen's motions for mistrial, but it allowed Larsen to read the questions he would have asked Boyd into the record and included the juror questionnaires in the record.

The jury assessed Larsen's punishment at five years' confinement and a $5,000 fine each for the intoxication assault and FSRA convictions, and two years' confinement and a $500 fine in the evading arrest or detention with a vehicle conviction. The jury returned affirmative findings on the use or exhibition of a deadly weapon in the intoxication assault and evading arrest convictions, and the trial court entered judgment on the verdicts. Larsen now appeals, complaining that he was entitled to a mistrial because of juror misconduct, that he suffered Double Jeopardy violations because of multiple punishments, and that his motions for continuance should have been granted.

## II. Jury Misconduct

In his third point, Larsen claims that the trial court erred by denying his motions for mistrial because of jury misconduct.

5

**A. Standard of Review**

We review a trial court's ruling on a motion for mistrial using an abuse-of-discretion standard of review, viewing the evidence in the light most favorable to the trial court's ruling and upholding that ruling if it was within the zone of reasonable disagreement. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). A trial court abuses its discretion in denying a motion for mistrial only when no reasonable view of the record could support the trial court's ruling. *See id*.

To obtain a mistrial for juror misconduct, the defendant must show that the juror withheld material information during voir dire despite due diligence exercised by the defendant. *Franklin v. State*, 138 S.W.3d 351, 355–56 (Tex. Crim. App. 2004). With respect to oral questions asked during voir dire, error occurs when "a prejudiced or biased juror is selected *without fault or lack of diligence on the part of defense counsel*, such counsel acting in good faith on the juror's responses and having no knowledge of their inaccuracy." *Gonzales v. State*, 3 S.W.3d 915, 916–17 (Tex. Crim. App. 1999).

Counsel must be diligent in eliciting pertinent information from prospective jurors during voir dire in an effort to uncover potential prejudice or bias, and, unless defense counsel asks questions calculated to bring out information that might be said to indicate a juror's inability to be impartial, the

6

purportedly material information which a juror fails to disclose is not really "withheld" so as to constitute misconduct which would warrant a reversal. *See id.* at 917. Counsel's questions must be specific, not broad. *Id*.; *see also Webb*, 232 S.W.3d at 113 ("The jury panel does not know the statutory challenges for cause and thus the prospective jurors likely do not know what the parties are trying to determine during voir dire. It is counsel's responsibility to ask questions specific enough to elicit the answers they require."); *Armstrong v. State*, 897 S.W.2d 361, 363–64 (Tex. Crim. App. 1995) (holding that there was no error where counsel did not ask question that would uncover juror's close friendship with prosecutor)*.*

## B. Analysis

Larsen's juror misconduct complaint was triggered by a note from juror Boyd to the trial court before jury deliberations. The note was about Micah Thompson, the mother of Larsen's three-year-old daughter; it stated:

Judge:

Micah was my next door neighbor for a year when she lived on Wandering Lane in Weatherford, Tx.

We didn't have an overly cordial relationship because she kept anywhere from ten to 20 dogs in her back yard and they barked constantly during the night.

7

> I don't remember [Larsen] but he could have been introduced once. Other than this knowledge, it will not affect any decision I would have in this case.

Larsen sought to take Boyd on voir dire about the note, and his questions included how Boyd knew Micah, whether she had ever met Larsen, whether Boyd's boyfriend knew Micah and ever had an a "altercation" with her,[5] and whether, in light of the altercation between Micah and Boyd's boyfriend, Boyd felt that she could "set aside any bias or prejudice [she] might have toward Micah Thompson and sit fairly in judgment on [Larsen][.]"[6]

We must review whether Larsen exercised due diligence during voir dire to elicit information regarding Micah Thompson and any conflicts involving her to determine whether he was entitled to a mistrial. *See Franklin*, 138 S.W.3d at 355–56.

---

[5] Larsen described the altercation as a business deal between Micah and Boyd's boyfriend, in which the boyfriend ended up owing Micah $200 and let Micah's dogs out of the backyard on several occasions. When Micah attempted to kick the boyfriend's door in, the boyfriend called the police, who ordered both parties to stay off of each other's property.

[6] Larsen also asserted that Micah would testify that Micah and Boyd got along well, but that Boyd did not like Larsen and that Boyd and Micah talked approximately once per month for one year and discussed Larsen's failure to pay child support or to visit his daughter. Larsen also claimed that Micah would testify that "there were several instances where—that the juror was very upset about the dogs that was [sic] at the house where Micah . . . lived; that the juror actually knew [Larsen] before she knew Micah . . . ; that Micah . . . met the juror and her boyfriend through [Larsen]."

8

On February 26, during voir dire, the State asked: "Anyone know the defendant, [Larsen]? Anybody feel like you know the defendant in any way? Perhaps you have a business that he visits, you know the family. Just anybody in any way feel like you know the defendant, [Larsen]?" When it was Larsen's turn, his attorney stated the following to the venirepanel:

> With the questionnaire that you filled out–and I want to thank you for that because that's made our jobs a lot easier–and with the thorough job that [the district attorney] has done, I think that my questioning of you is going to be quite a bit briefer than his . . . . This is [Larsen]. He is the defendant. . . . And, again, does anyone recognize [Larsen]? Without going into a lot of the evidence, [Larsen] is 26 years old, and he's lived in this area for roughly the past four or five, six years. Does anyone— after knowing that information, does anyone recognize [Larsen]?

None of the potential jurors responded that they knew or recognized Larsen.

Micah Thompson was not mentioned until the punishment trial began, on February 27, and then only in passing during Officer Stewart's testimony.[7] Her name was mentioned again on February 28 during Larsen's direct testimony about his minor daughter, who has his last name, and with regard to where he

---

[7] Larsen's attorney asked Officer Stewart whether he ever told Micah that he did not feel Larsen should have criminal charges pursued against him. Officer Stewart said that he did not.

was going the night he collided with Officer Stewart.[8]  Also that day, Max Thompson testified that he knew Larsen because Micah was his daughter and that Larsen started dating her four years before the trial.

On March 1, during Micah's mother's testimony, she pointed out Micah in the courtroom at Larsen's attorney's request.  Boyd's note was dated the same day that Micah's mother pointed Micah out in the courtroom.

Based on the record, Larsen failed to show that he exercised due diligence or that Boyd "withheld" any information during voir dire.  *See id*.  Specifically, no one asked the potential jurors if any knew Micah Thompson, formerly of 221 Wandering Lane, who was Larsen's girlfriend and the mother of his child, or if they, or any of their friends or family, had ever had any altercations with Micah Thompson or Larsen.  *See Gonzales*, 3 S.W.3d at 917; *Whiting v. State*, 943 S.W.2d 102, 105 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (holding that juror did not give false information to attorneys during voir dire where the record reflected that he did not realize that he knew the victim until he saw the victim walk into the courtroom during trial).

---

[8] "I was going to 221 Wandering Lane . . . . it was a residence that Micah Thompson and I used to share."  Micah had sold that house, but Larsen testified that he did not remember that and that he was heading for the house "[b]ecause [he] was scared and [he] wanted to go to a place that [he] felt safe."  On her juror questionnaire, Boyd revealed that she lived at 229 Wandering Lane.

10

The cases upon which Larsen relies, *Von January v. State*, 576 S.W.2d 43 (Tex. Crim. App. 1978), and *Salazar v. State*, 562 S.W.2d 480 (Tex. Crim. App. 1978), are inapposite. In *Von January*, defense counsel specifically asked whether any of the prospective jurors knew "George Parker, Sr., George Parker, Jr., or George Parker, III (the deceased)," and the juror in question did not respond, even though he recognized George Parker Sr. when he entered the courtroom with the jury panel and had known the Parkers well for around thirty years. 576 S.W.2d at 44. In *Salazar*, the State specifically asked, in an indecency with a child case involving a Mexican-American defendant, whether any of the venire had ever been a witness in a criminal case, and the juror in question indicated that he had not. 562 S.W.2d at 481, 483. The juror later revealed to the court that he had given false information during voir dire in that he had been a witness in a criminal case five years before, when he was an eyewitness to a sexual assault on his own daughter by a Mexican-American male. *Id*. at 481–82.

In contrast, here, neither Larsen nor the State asked any questions about, or even mentioned, Micah Thompson during voir dire. Although Larsen blames Boyd for "her failure to respond," he presented nothing to the venire for Boyd to respond to. Therefore, the trial court did not abuse its discretion by denying his motion for mistrial. We overrule Larsen's third point.

11

### III. Double Jeopardy

In his second point, Larsen contends that his convictions and punishments for the three offenses violate Double Jeopardy protections under the Texas and federal constitutions. Specifically, Larsen argues that "all three charges, convictions[,] and punishments occurred in the same criminal episode and transaction." He claims that there was no causal break between the three offenses, resulting in multiple punishments for the same act.

### A. Standard of Review

The Double Jeopardy Clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense. U.S. CONST. amend. V. Generally, this clause protects against multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Ex parte Herron*, 790 S.W.2d 623, 624 (Tex. Crim. App. 1990) (op. on reh'g). However, separate convictions for different offenses arising from a single criminal transaction do not violate the prohibition against double jeopardy. *See Haight v. State*, 137 S.W.3d 48, 51 (Tex. Crim. App. 2004).

To determine whether both offenses are the same, we must examine the elements of the applicable statutes to determine whether each statute "requires proof of an additional fact which the other does not." *Blockburger v. United*

12

*States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932); *see United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993); *Parrish v. State*, 869 S.W.2d 352, 353–55 (Tex. Crim. App. 1994). But in multiple punishments cases, the court of criminal appeals has recognized that *Blockburger* is not the exclusive test and requires a two-step analysis. The first step is to examine the proof necessary to establish the statutory elements of each offense as alleged in the indictment. *Vineyard v. State*, 958 S.W.2d 834, 836 (Tex. Crim. App. 1998). The second step requires an analysis of the legislative intent, i.e., whether it was the legislature's intent to impose multiple punishments or only one. *Ervin v. State*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999); *see also Ex parte Cavazos*, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006). A defendant suffers multiple punishments in violation of the Double Jeopardy Clause only when he is convicted of more offenses than the legislature intended. *Ervin*, 991 S.W.2d at 807.

**B. Analysis**

Larsen was convicted of intoxication assault, FSRA, and evading arrest or detention with a vehicle offenses. The elements of an evading arrest or detention with a vehicle offense are that the person intentionally flees, using a vehicle, from a person that he knows is a peace officer attempting to lawfully arrest or detain him. *See* TEX. PENAL CODE ANN. § 38.04(a), (b)(1). The

13

elements of an intoxication assault offense require that a person, by accident or mistake, operate a motor vehicle in a public place while intoxicated and cause serious bodily injury to another. *See id.* § 49.07. The elements of a FSRA offense require that the operator of a vehicle involved in an injury-accident intentionally or knowingly fail to immediately stop or return to the accident scene and to remain there until he complies with section 550.023 of the transportation code. *See* TEX. TRANSP. CODE ANN. § 550.021(a), (c) (Vernon Supp. 2007). Section 550.023 of the transportation code requires providing any person injured in the accident with reasonable assistance. *Id*. § 550.023(3) (Vernon 1999).

FSRA and evading arrest with a vehicle do not require intoxication; intoxication assault does not require the perpetrator to stay and render reasonable assistance, or that the offender intentionally flee from authority. *See State v. Marshall*, 814 S.W.2d 789, 796−97 (Tex. App.—Dallas 1991, pet. ref'd); *see also Ephraim v. State*, 237 S.W.3d 438, 440−41 (Tex. App.—Texarkana 2007, pet. ref'd) (holding that there was no double jeopardy violation in convictions for "unsafe speed" and "intoxication assault," although the offenses shared some common elements, because the unsafe speed charge did not require proving bodily injury or driver intoxication, and the intoxication assault charge did not require proving that the offender used more excessive

14

speed than was reasonable and prudent under the circumstances).  These are all separate and distinct offenses—the only common element of all three is that a motor vehicle must be involved.  See *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182; *Vineyard*, 958 S.W.2d at 836.

According to *Ervin*, we must now review whether the legislature intended multiple punishments.  *Ervin* set out a nonexclusive list, which includes whether: (1) the offenses' provisions are contained within the same statutory section, (2) the offenses are phrased in the alternative, (3) the offenses are named similarly, (4) the offenses have common punishment ranges, (5) the offenses have a common focus, or "gravamen," and whether that common focus tends to indicate a single instance of conduct, (6) the elements that differ between the offenses can be considered the "same" under an imputed theory of liability which would result in the offenses being considered the same under *Blockburger*, and (7) any legislative history containing an articulation of an intent to treat the offenses as the same or different for Double Jeopardy purposes.  *See* 991 S.W.2d at 814.

With regard to evading arrest or detention, the legislature has explicitly provided that "[a] person who is subject to prosecution under both this section and another law may be prosecuted under either or both this section and the other law."  TEX. PENAL CODE ANN. § 38.04(d).  Therefore, as to the conviction

15

and punishment for evading arrest or detention with a vehicle, Larsen's Double Jeopardy protections were not violated. *See id.*

Applying *Ervin* to the other two offenses, intoxication assault and FSRA are not contained within the same statutory sections: intoxication assault is located in the penal code, under the chapter entitled, "Intoxication and Alcoholic Beverage Offenses," and FSRA is located in the transportation code, under the chapter entitled "Accidents and Accident Reports." They are not phrased in the alternative or similarly named, although there is some overlap in their punishment ranges.[9] The focus of the offenses differs, in that under intoxication assault, an offender is punished for *causing* bodily injury to another with his vehicle, regardless of intent, while the offender was intoxicated. In contrast, under FSRA, an offender is punished for *intentionally abandoning* someone that he injured with his vehicle, drunk or sober. And the elements that differ between these offenses cannot be considered the "same" under an imputed theory of liability. *See Marshall*, 814 S.W.2d at 797 (holding that the State was not barred by double jeopardy from prosecuting the defendant for

---

[9] Intoxication assault here was a third degree felony, involving a punishment range from two to ten years' confinement and a fine not to exceed $10,000; FSRA's punishment range provides for confinement of one to five years and a fine not to exceed $5,000. TEX. PENAL CODE ANN. §§ 12.34, 49.07(c); TEX. TRANSP. CODE ANN. § 550.021(c)(2).

16

FSRA after obtaining a conviction for DWI for the same event). Under *Ervin*, FSRA and intoxication assault do not constitute the same offense. *See Ervin*, 991 S.W.2d at 814; *see also Villanueva v. State*, 227 S.W.3d 744, 753 (Tex. Crim. App. 2007) (Keller, P.J., dissenting) ("The legislature has shown a willingness to impose additional criminal liability for a person's failure to mitigate the results of his (or others') conduct. Failure to render aid is a stand-alone offense, as is failure to report a felony and failure to stop and render aid, to mention but a few examples. These statutes reflect the legislature's effort to encourage the amelioration of injury."). We conclude that Larsen's Double Jeopardy protections were not violated and we overrule Larsen's second point.

## IV. Motions for Continuance

In his first point, Larsen argues that the trial court erred by denying his motions for continuance.

### A. Standard of Review

The denying of a motion for continuance is within the sound discretion of the trial court. *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006); *Heiselbetz v. State*, 906 S.W.2d 500, 511–12 (Tex. Crim App. 1995). A defendant must show "specific prejudice to his defense" to establish that the trial court abused its discretion by refusing to grant a continuance. *Renteria*,

17

206 S.W.3d at 699; *Heiselbetz*, 906 S.W.2d at 511–12. Examples of specific prejudice include unfair surprise, an inability to effectively cross-examine the State's witnesses, and the inability to elicit crucial testimony from potential witnesses. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 825 (1997); *Dotson v. State*,146 S.W.3d 285, 297 (Tex. App.—Fort Worth 2004, pet. ref'd).

## B. Analysis

Larsen argues that he established at the hearing

> his diligence, material facts, that the requested continuance was through no fault of his own part for the delay, that the motion was not made for delay, as well as the fact that the late disclosures by the State precluded his being ready for trial because of the absence of a material witness, and of course: prejudice from the denial of the requested continuance.

He contends that "[b]y denying the requested continuance herein the trial court denied [Larsen] the ability to adequately prepare his case as to punishment, the only contested matter before the Court and the jury," and because he received confinement instead of community supervision, he suffered harm.

At the continuance hearing, Larsen did not dispute the State's argument that he had caused his own delay by failing to show up at previously scheduled

18

meetings with his expert.[10] Furthermore, although Larsen contended during the motion hearing that he needed additional meetings with Dr. Fallis because "[t]here has to be some testing scored in order for her to be prepared to testify[,]" the record reflects that Dr. Fallis was able to complete the test scoring in time to testify, and that she felt she had enough time to evaluate Larsen for valid results.[11] Therefore, Larsen has failed to show any specific prejudice or harm with regard to the denial of his motions for continuance as to the expert witness. *See Janecka*, 937 S.W.2d at 468.

As to Larsen's notice argument, Larsen claims that the trial court erred by denying his motions because he needed "to investigate with respect to 2 witnesses substituted for those he was put on notice by the State would testify only the week before the trial." Yet Larsen never identified which witnesses he complained of, either in his motions or at the hearing. Instead, he merely complained that "the [S]tate has provided us with additional information about witnesses in this case within the last week with regard to prior bad acts. And, additionally, we need more time to prepare for those witnesses at the time of

---

[10] At trial, Dr. Fallis testified that Larsen missed at least two appointments with her.

[11] In response to the question by Larsen's attorney with regard to whether she had enough time to evaluate Larsen, Dr. Fallis stated, "Yes. I feel confident about the things that are in my report."

19

trial." In his motion, he added that he needed the additional time "to prepare cross-examination of these witnesses."

At the hearing, Larsen did not contradict the State's assertion that there was only one new witness, Officer Scott Bird. The State contended that Officer Bird was one of two officers in a Wal-Mart theft incident and that the arrest record produced earlier by the State to Larsen listed both officers; Officer Bird was the officer who had written the report included in the arrest record.[12]

During the punishment trial, Officer Bird testified to the same facts listed in the report; Larsen thanked the officer for his testimony but did not cross-examine him. Larsen testified to the same facts during his direct examination, admitting that he had committed the offense by switching the price tag from an expensive item, a pair of boots, to "a lesser-price tagged item."

In his brief to this court, Larsen has failed both to identify any specific witness or to explain how he was specifically prejudiced by the trial court's denial of his motions for continuance with regard to any specific witness. *See*

_____

[12] The record does not contain any witness lists; however, it does contain the State's subpoena applications. The State filed a subpoena application for Officer Bird on February 22, at 1:30 p.m. Larsen filed his motions for continuance at 3:15 p.m. that day. To the extent that Larsen's complaint concerns Joyce Ho and Raymond Waller, persons named in the State's subpoena applications filed February 14, eight days earlier, neither testified at trial. Therefore, no prejudice was shown.

20

*Heiselbetz,* 906 S.W.2d at 511–12 (requiring establishment of "specific prejudice" from a trial court's failure to continue the trial); *see also* TEX. R. APP. P. 38.1(h) (requiring that a brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

Because Dr. Fallis was able to provide the testimony Larsen hired her to provide, and because Larsen opted not to cross-examine Officer Bird and testified to the same facts as Officer Bird, Larsen has failed to show that he was actually prejudiced by the denial of his motions for continuance. *See Heiselbetz*, 906 S.W.2d at 511–12; *Dotson*, 146 S.W.3d at 297. Therefore, the denial of his motions did not constitute an abuse of discretion. We overrule Larsen's first point.

### V. Conclusion

Having overruled all of Larsen's points, we affirm the judgments of the trial court.

PER CURIAM

PANEL F: MCCOY, J.; CAYCE, C.J.; and WALKER, J.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: June 26, 2008

21