Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-10-00668-CR

Robert **ESPARZA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2010CR5894
Honorable Raymond Angelini, Judge Presiding

Opinion by:  Marialyn Barnard, Justice

Sitting:  Catherine Stone, Chief Justice
Phylis J. Speedlin, Justice
Marialyn Barnard, Justice

Delivered and Filed:  October 12, 2011

AFFIRMED

A jury convicted appellant Robert Esparza of aggravated sexual assault of a disabled individual. The trial court sentenced him to seven years confinement and ordered him to pay a $10,000 fine. Esparza raises a single issue on appeal, contending the evidence is legally insufficient to support his conviction. We affirm the trial court's judgment.

**BACKGROUND**

The complainant is a thirty-four-year-old female with Down's Syndrome, mental retardation, hyperthyroidism, profound hearing impairment in her left ear, and a speech impediment that makes it difficult to understand her at times. The evidence showed the complainant requires twenty-four hour supervision because she is unable to care for herself or interact safely in the community at large. The complainant's diagnoses of Down's Syndrome and mental retardation were made shortly after her birth. Accordingly, she was placed in special education programs and was ultimately able to graduate from high school at the age of twenty-two. There was evidence that her mental retardation level is categorized in the mild to moderate range, and her "adaptive behavioral level" is equivalent to that of a child of eleven years and seven months. Because of her retardation and adaptive behavioral levels, the complainant was not allowed to open the front door, cook, or use the microwave oven.

Despite her disabilities, the complainant wanted to move out of her parents' home. Because of her disabilities, however, she could not live without supervision so she moved into a group home with two other disabled women and a staff that provided constant supervision. The complainant used the services of the Unicorn Center, which provides a supervised work environment for the mentally disabled and through which they learn life skills, receive vocational training, and earn spending money. According to the evidence, the Unicorn Center accepts only those clients who are mentally retarded and lacking in two or more adaptive living skills.

Because of her disability, the complainant qualified for VIA Metro Transit services for the disabled, which due to high demand, VIA contracts out to Star Shuttle. According to testimony from VIA Metro Transit's manager of accessible services, Kathy Brown, these services are provided, after an assessment, to those who are physically or mentally unable to ride

a public bus. Those who are provided this service are assessed on a case-by-case basis to determine their need level. Brown testified that after the complainant's assessment, it was determined "she had a cognitive disability, secondary to Down['s] [S]yndrome, which significantly impacted her ability to independently utilize bus service." The complainant was found to exhibit "very poor judgment" and to need "a great deal of supervision for activities of daily living." In fact, given the complainant's level of disability, VIA was given instructions that she could not be left alone. The complainant had to be signed in and out of her group home and the Unicorn Center, and the shuttle could not drop her off unless there was someone there to meet her.

Esparza worked for Star Shuttle. On July 28, 2009, the complainant was returning to her group home from the Unicorn Center on the Star Shuttle driven by Esparza. At trial, the complainant testified she would be the last person to be dropped off, so she sat in the front of the vehicle with "Robert," which is how she referred to Esparza throughout her testimony. She told the jury that after all the other passengers were off the bus, Esparza pulled in behind a restaurant and "tried to assault her."[1] The complainant stated she and Esparza got out of the vehicle, and he was kissing her on the lips. She denied telling him it was "okay" for him to kiss her and said Esparza did not ask for permission to kiss her. Eventually, Esparza took her into the back of the vehicle. He took her clothes off, but he remained dressed. She said Esparza tried to kiss her "in different areas," and that he kissed her breast and her "private area." When the prosecutor asked the complainant what she meant by "private area" the complainant whispered, "my vagina." The complainant testified Esparza put his fingers inside her and she "got really scared." During the

---

[1] Although the complainant testified they pulled in behind the China Sea restaurant, the vehicle's GPS showed the location was actually behind a carpet business.

assault, Esparza told the complainant she was "good looking," but he also tried to hurt her by tightly squeezing her arms with his hands.

During cross-examination, the complainant testified she and Esparza had a "private conversation" about boyfriends. When asked whether this conversation might have led Esparza to believe she wanted him to be her boyfriend, the complainant was adamant this was not the case, stating "Robert is not my type." She denied touching Esparza, testifying that he touched her, putting his hand on her vagina when they were still in the front of the vehicle. The complainant told the jury she "forgot" to tell Esparza that she did not like the way he was talking to her or touching her.

On redirect, the prosecutor again asked whether Esparza had asked for permission to touch her. The complainant testified he never asked, and if he had she would have said "Leave me alone, do not bothering [sic] me."

Esparza returned the complainant to the group home. The complainant testified she did not initially tell anyone at the group home what happened because she "forgot," but explained Esparza told her "not to share this with no one." She also said that if she told, Esparza "might do something to me." The complainant said she told Jessica Walker, a staff member at the group home, what happened the day after the incident. She also testified she told "the cops," but when pressed, could not say who she told first. It was clear, however, that the day after the assault by Esparza the complainant went to Jennifer Steger, a vocational service coordinator at the Unicorn Center. Steger, who had known the complainant for five years, testified that on July 29, 2009, the complainant came to her office right before the Star Shuttle was to pick her up. The complainant came into the office and shut the door. Steger stated the complainant was "panicking," "crying," and "looked really scared." Steger was not permitted to testify about

what the complainant told her, but immediately after her conversation with the complainant, Steger called the group home and arranged for someone to pick up the complainant. Steger suggested to the complainant that she report what had happened.

Although it is unclear exactly how the matter was reported, the evidence shows that on July 29, 2009, the complainant was taken to the emergency room where she was met by her stepmother. The stepmother testified the complainant was "frightened," "upset," and "panicky." While at the emergency room, the stepmother spoke to a San Antonio police officer and a nurse. After an initial evaluation, the complainant was transferred to another hospital for a sexual assault examination. According to the stepmother, the complainant was still "very upset," "very distraught and anxious," and was suffering from stomach pain and vomiting. Although the complainant was intermittently calm, she would also cry and complain of stomach pain.

The evidence showed the complainant was examined by a sexual assault nurse examiner ("SANE"). The complainant told the SANE she had been sexually assaulted by Esparza the day before. The SANE, reading from her report, testified the complainant told her:

> On the VIA, this guy named Robert, when I was going home . . . he pulled up to the Chinese Seed [sic] behind the houses. He pulled up. He was kissing me, had sex with him. He kissed me on my breast, nose, ears, and also my private area to my butt. He took off my pants and panties and my belt off. And also he kissed by nose. I called it sexual abuse, sexual harassment. He touched me everywhere.

The complainant was asked to clarify what she meant by "had sex with him." In response, the complainant told the SANE that Esparza "put his finger inside my vagina, but not with his penis," and "[h]e put my pants back on everything else . . . I did not touch him at all." The complainant also said Esparza put his mouth on her vagina, and put his fingers and his mouth on her butt or anus and his mouth on her mouth. In response to additional questions, the

complainant told the SANE only one person attacked her and that person was Hispanic and a stranger.

The SANE testified the complainant was "tearful" during the examination, which disclosed tenderness in the complainant's vaginal area, precluding further internal examination. The SANE stated she would document the tenderness as an injury because normally there should not be pain in the vaginal area. The SANE admitted on cross-examination there was no bruising or other injury documented. The SANE also admitted that when she asked the complainant about threats, she denied any weapons or threats were used.

As a result of the complainant's claim, Star Shuttle was contacted. Larry Gray, the operations manager for Star Shuttle, testified Esparza was a Star Shuttle employee–specifically a paratransit driver–and had been with the company for four to five years or possibly longer. Gray told the jury Star Shuttle employees go through "extensive training," which includes sensitivity training for dealing with clients with impairments. Employees are taught to keep conversations "nonpersonal." Employees continue to receive three or four training sessions throughout each year.

Gray testified that on July 30, 2009, he received a complaint about Esparza that alleged improper conduct with the complainant. In response, Gray began an investigation, which revealed that on July 28, 2009, Esparza was working and was the driver who transported the complainant. Gray also looked at the GPS on the vehicle Esparza was driving on July 28, 2009, and found Esparza "stopped at a place that was not on his route for a certain amount of time." Thereafter, Gray and other members of management called Esparza in to give a statement. Gray said Esparza voluntarily came in the next morning, alone, and gave a statement. Gray testified Esparza admitted having "inappropriate contact" with the complainant. Esparza also voluntarily

prepared a handwritten incident report in Gray's presence. In the report, Esparza related the conversations he had with the complainant during the ride, including his claim that the complainant talked about not having a boyfriend. According to Esparza's report, the complainant told Esparza she liked him and caressed his arm. Esparza admitted he should have told her to stop, but instead told her she would find a boyfriend because she was pretty.

After Esparza dropped off the other passengers, he claimed the complainant leaned toward him and he kissed her. She allegedly told him she loved him. Although he admitted once again he should have stopped, he did not. Rather, he pulled into a parking lot behind a carpet business, got out, and asked the complainant if she would rather go in the back of the van with him or go to the group home for dinner. According to Esparza's report, the complainant got out and "began holding [Esparza] tightly." Esparza then began to kiss her and again asked her if she would like to go into the back of the vehicle or go home. Esparza claimed the complainant elected to go into the vehicle with him.

Esparza admitted kissing the complainant, asking her if she had done this before. He admitted she said "no," but he nevertheless "tried to kiss her below her belly button," trying to remove her pants. He claimed she ultimately removed her pants because he could not. Esparza wrote that he "tried kissing her again below her belly button, but I wasn't able to get comfortable, so I tried – I tried – I tried penetrating her with a finger." Esparza claimed the complainant smiled when he penetrated her, but admitted she claimed "something hurt." He wrote that he stopped at that point and the complainant got dressed. Esparza concluded by writing he "should have used better judgment."

Ultimately, during the police investigation, the investigating detective, Robert Valadez, called Star Shuttle to see if Esparza was working because he wanted to talk to him. According to

Detective Valadez, two of Esparza's supervisors brought Esparza to police headquarters. After advising Esparza that he could stop the interview at any time and that he was free to leave at any point, Detective Valadez conducted an interview with Esparza, which was recorded on video.

The videotaped statement was similar to that given to Esparza's employer. However, in the videotaped statement, Esparza admitted he knew by looking at her that the complainant had Down's Syndrome. He also admitted he knew she had a mental disability. Esparza admitted using "bad judgment" in his interactions with the complainant, but stated he did not believe he had broken the law. He also stated he believed a person with Down's Syndrome could consent to sex.

Esparza also testified at trial. He claimed his intent was to just "make out" with the complainant, but he claimed things escalated when the complainant lifted her shirt and bra over her breast. Esparza claimed he was surprised because he never suggested she do that. He testified he took her actions as a request that he kiss her breast. He referred to the complainant's alleged action as a "nonverbal visual invitation." Esparza's claim at trial that the complainant lifted her shirt and bra was contrary to his statement to Detective Valadez in which he stated he raised her shirt.

Esparza admitted asking the complainant if she wanted to get into the backseat with him or go home for dinner, and claimed the complainant responded by stating, "Oh, definitely, I'd like to go to the back." Although he claimed he only intended to "make out" with the complainant once they got into the back of the vehicle, he admitting kissing her breast and kissing down to her navel. Esparza told the jury that the complainant then pulled her shirt down, and he, believing she was attempting to tuck her shirt back into her pants, assisted her in unbuckling the belt to her pants. He said he was unable to help given the small space so he

stopped and the complainant continued to unbuckle the belt on her own. According to Esparza, the complainant then unzipped her pants and pulled the pants and her underwear down to her knees. Esparza claimed to be confused at this point, since he still had his clothes on, about what the complainant "was considering." He concluded, given that the small space precluded him removing his pants, the complainant intended for him to kiss her below her belly button, which he did. Esparza denied kissing her vagina, claiming the small space precluded it. Because he believed the complainant was moaning–as she would if she were receiving a back rub–he took it as his cue to rub her vaginal area "to stimulate or provide pleasure." Claiming he was surprised at how comfortable the complainant was with his actions–because he did not expect her to be–he continued and inserted his finger into her vagina. Esparza testified that when he did that, the complainant "looked[ed] up to see what was going on. She looked to see what I was doing. And when she saw, "she did smile about it and laid her head back down." Esparza stated he took the complainant's lack of a verbal response as "confirmation that she seemed to be enjoying the, uh, the experience." Esparza said he stopped touching the complainant when she said, "Okay, I need to go." He testified he helped the complainant redress and took her home.

Esparza denied ever receiving any kind of communication from the complainant that she was uninterested in a sexual encounter with him. However, he admitted telling the complainant not to tell anyone what had happened, claiming he was worried about losing his job and that his wife, who also worked for Star Shuttle, would find out.

On cross-examination, Esparza again admitted kissing the complainant on the breast and "all over the place." He also reconfirmed digital penetration of the complainant. Esparza stated he had worked with the handicapped through Star Shuttle for seven years, and was very familiar with their needs. He admitted the complainant's "route form" documented her mental

retardation, and he was told of her handicap. Esparza also admitted that when he was conversing with the complainant he found her "childlike."

After receiving the court's jury charge and instructions, hearing arguments of counsel, and deliberating, the jury found Esparza guilty of aggravated sexual assault of a disabled individual. After the trial court sentenced him to seven years confinement, Esparza perfected this appeal.

## ANALYSIS

In a single issue, Esparza contends the evidence is legally insufficient to support his conviction. More specifically, Esparza contends the evidence is legally insufficient to sustain his conviction because the State failed to prove the complainant's inability to consent.

Since the decision of the court of criminal appeals in *Brooks v. State*, appellate courts in Texas use only the *Jackson v. Virginia* standard of review to analyze sufficiency challenges. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010); *see Jackson v. Virginia*, 443 U.S. 307 (1979). Under the *Jackson v. Virginia* standard, we view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 899. This standard of review takes into account the trier of fact's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Therefore, in analyzing the legal sufficiency of the evidence, we will determine whether the necessary inferences are reasonable based on the combined force of the evidence, direct and circumstantial, when viewed in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the evidence in the record supports conflicting inferences, we must presume the trier of fact resolved the conflicts in favor

of the State and defer to that determination. *Id.* Moreover, resolution of conflicts or inferences therefrom is within the exclusive province of the jury, and the jury may choose to believe all, none, or some of the evidence or testimony presented. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995); *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

To prove the charge of aggravated sexual assault of a disabled individual, the State must prove beyond a reasonable doubt that the defendant "intentionally or knowingly cause[d] the penetration of the sexual organ of another person by any means, without that person's consent and the victim is a disabled individual." TEX. PENAL CODE ANN. § 22.021(a)(2)(C) (West 2011). Consent, in the context of a sexual assault, is not effective "if the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or resisting it." *Id.* § 22.011(b)(4). A "disabled individual" is a person over the age of fourteen who, because of age or physical or mental disease, defect, or injury, is substantially unable to protect herself from harm or to provide food, shelter, or medical care for herself. *Id.* § 22.04(c)(3). In this case, the State asserted in the indictment that Esparza intentionally or knowingly penetrated the complainant's sexual organ with his finger without her consent in that Esparza knew that as a result of a mental disease or defect the complainant was incapable either of appraising the nature of the act or resisting it.

On appeal, Esparza does not contest the sexual act occurred where and when the State alleged, or that the complainant was a disabled individual. Rather, appellant contends only that the State failed to prove beyond a reasonable doubt "the penetration was without the complainant's consent," i.e., the complainant was incapable of appraising the nature of Esparza's act or resisting it. Esparza argues the evidence establishes the complainant was able to consent and did.

In support of his argument, Esparza contends there was evidence to establish the complainant was "mildly retarded," but functioned at a "fairly high level given her mental abilities." Esparza argues that merely living in a group home and having the ability to perform only piece-rate contract work did not mean the complainant was incapable of consenting to a sexual encounter. He points out that Texas law does not per se provide that a mildly mentally retarded person with Down's Syndrome cannot consent to a sexual encounter, and that to so hold "would likely be deemed unconstitutional."

Esparza contends we must decide whether there was effective consent in a case involving a mentally retarded person on a case-by-case basis, and the evidence in this case tends to show the complainant could consent–was able to appraise the nature of the act or resist it. In support, Esparza points out the complainant consented to the sexual assault examination, showing the medical staff believed she understood the nature of the examination sufficiently to consent to it. Esparza claims that if she understood the nature of the examination, she must have understood the nature of the sexual act. He claims her narrative to the SANE, in which she explained she had sex with Esparza when he "put his finger inside my vagina, but not with his penis," shows her understanding of the sexual act that occurred. Esparza points to her correct use of terminology, including proper references to male and female genitalia and the fact that she evidently knew having sex could involve penetration with a finger or a penis.

Esparza points out the complainant "functioned well within the constraints of her abilities," in that she lived away from home, she performed required tasks in the group home, and she worked. He contends the fact that she may have had "boyfriends" establishes her functionality.

Esparza also points to the complainant's testimony in which she stated Esparza "forgot" to get her permission for the sexual encounter and if he had asked she would have told him to leave her alone, claiming this is evidence she understood the nature of the sexual act and was capable of stopping him. He suggests that because in her testimony she used the words "kissing" and "making out," suggested the complainant clearly understood what was happening and consented to it. Esparza argues that because "[o]ne does not 'make out' alone," the complainant's use of this phrase is evidence of her understanding of and consent to the encounter with Esparza. And, as to her testimony that she "got really scared" when appellant penetrated her, Esparza claims this is actually evidence that she understood what was happening and could have said "no" at that point, but did not.

Based on the evidence and inferences therefrom, Esparza claims no rational trier of fact could have found the State proved an absence of consent due to a mental deficiency that prevented the complainant from appraising the nature of the sexual act or from resisting it. Esparza therefore claims we must reverse and render a judgment of acquittal. We disagree.

We hold the evidence in the record and the inferences therefrom, at best, establish conflicting inferences regarding the complainant's ability to understand what was happening and to resist it. The evidence established, beyond her mental retardation and Down's Syndrome, that the complainant had a severe hearing impediment, a speech impediment, and was unable to care for herself unsupervised. The complainant's stepmother testified the complainant could not be trusted to open the front door without an adult because "she wouldn't have good judgment about whether or not she could open the door to a stranger." The complainant was not permitted to cook without supervision, even when using the microwave. The stepmother testified the

complainant needed constant supervision because she "doesn't have good community safety skills."

Other evidence bears out the stepmother's testimony. Due to her disabilities, she needed a group home that provided twenty-four hour a day supervision. Star Shuttle drivers were specifically instructed that the complainant could not be left alone when she traveled–someone had to sign her in and out at the group home and at work.

By his own admission, Esparza knew about the complainant's disabilities. The information was on the complainant's route sheet and Esparza stated he could tell she suffered from Down's Syndrome by looking at her. Esparza described the complainant's conversations with him as "childlike."

The day after the assault, when it was time for the complainant to catch the Star Shuttle from the Unicorn Center back to the group home, the complainant was "panicking," "crying," and "looked really scared." Although the Unicorn Center worker was not permitted to testify about what the complainant told her, immediately after her conversation with the complainant, Steger called the group home and arranged for someone pick up the complainant. It could be inferred from this evidence that the complainant did not understand what happened to her the day before, but that it was bad and she did not want to encounter the perpetrator or have it happen again. *See Clayton*, 235 S.W.3d at 778. The evidence also established the complainant was extremely distraught when taken to the hospital for her sexual assault examination. The jury could have taken this as a further indication that she knew something bad had happened to her– something she neither understood nor wanted.

From the evidence, we hold it was possible for the jury to have inferred the complainant, given her disabilities, was unable to appraise the nature of the sexual act perpetrated by Esparza

- 14 -

or to resist it. The jury could have found the complainant's so-called sexual knowledge was nothing more than basic information she had learned about the particular names for certain body parts and certain acts, but that she did not really understand what was meant, such that she could appraise the situation or resist it when confronted by an adult male. The jury could have inferred the complainant's failure to verbally say "yes" or "no" to Esparza was due to an absence of understanding of what was happening to her, not because she understood it and agreed to it. And, the jury could have determined that understanding and agreeing to a medical procedure or examination did not necessarily mean the complainant knew what Esparza was doing to her or had the mentality to stop him.

The evidence in this case is similar to evidence found sufficient to support a conviction in other cases involving disabled individuals. *See, e.g., Rider v. State*, 735 S.W.2d 291 (Tex. App.—Dallas 1987, no pet.); *Martinez v. State*, 634 S.W.2d 929 (Tex. App.—San Antonio 1982, pet. ref'd). In *Rider*, the defendant worked at a residential facility for mentally retarded adults. 735 S.W.2d at 291. The defendant was alleged to have assaulted a twenty-nine-year-old resident of the facility. *Id.* At trial, the complainant's mother testified the complainant had spent most of his life in facilities for the mentally retarded. *Id.* at 292. There was also evidence the complainant was considered mildly retarded–much like the complainant in the case before us. *Id.* Similarly, the complainant testified. *Id.* at 293. The defendant was convicted, and on appeal, the appellate court found the evidence sufficient to support the jury's finding that the complainant was incapable of either appraising the nature of the act or of resisting it. *Id.*

In *Martinez v. State*, this court affirmed the defendant's conviction for sexual assault of a twenty-nine-year-old woman. 634 S.W.2d at 932. The complainant's family testified regarding the history of her mental deficiencies and her current abilities. *Id.* at 933. The complainant

herself testified to her version of events. *Id.* There was evidence showing the complainant's disabilities would be apparent after a short encounter with her, and that the complainant was easily deceived. *Id.* at 933-32. We found the evidence sufficient to support the jury's finding that the complainant was unable to appraise the nature of the act or of resisting it. *Id.* at 936.

Obviously, Esparza raised possible inferences favorable to an absence of consent. However, the applicable law requires us to review the evidence in the light most favorable to the jury's verdict, and when the evidence supports conflicting inferences, we must presume the trier of fact resolved the conflicts in favor of the State and defer to that determination. *Clayton*, 235 S.W.3d at 778. And, extremely relevant to this case, when a jury has the advantage of observing a complainant who is alleged to be disabled and hears testimony about her mental abilities, we will not disturb the verdict where it is supported by the record. *See Martinez*, 634 S.W.2d at 935-36. In such cases, the jury is in a far better position to determine whether the complainant had the mental capacity to appraise the sexual encounter or to resist it. *Id.*

## CONCLUSION

Based on the foregoing, we hold the evidence was legally sufficient to support the jury's implied finding regarding consent, i.e., that the complainant was unable to appraise the nature of Esparza's sexual attack or to resist it. Accordingly, we overrule Esparza's sole issue and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish