

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00118-CR

Aaron Patrick **ALANIZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2011CR1543
The Honorable Angus McGinty, Judge Presiding

Opinion by:      Marialyn Barnard, Justice

Sitting:         Catherine Stone, Chief Justice
                 Marialyn Barnard, Justice
                 Patricia O. Alvarez, Justice

Delivered and Filed:  March 12, 2014

AFFIRMED

A jury convicted appellant Aaron Patrick Alaniz of murder. The trial court sentenced

Alaniz to confinement for life in the Texas Department of Criminal Justice–Institutional Division.

On appeal, Alaniz contends the evidence is legally insufficient to support his conviction. We

affirm the trial court's judgment.

## BACKGROUND

According to the testimony at trial, in the summer of 2007, Alaniz conspired with several people to commit a robbery. The conspirators carried out their plan, luring the victim, Vicente Alvarez-Huerta, to a vacant lot. During the robbery, Alvarez-Huerta was shot and killed.

At trial, the State relied upon two main witnesses: Victoria Ochoa and Vanessa Tunchez, who were part of the group that planned the robbery. The group, which included Ochoa, Tunchez, Alaniz, and others were at the apartment Tunchez shared with her boyfriend, Robert Medellin.[1] Ochoa testified the group needed money and decided to commit a robbery. According to Ochoa, the plan required her to pretend she was a prostitute and lure a victim to a vacant lot. Once there, three of the male conspirators would commit the robbery.[2] Ochoa claimed that although there was a discussion about a gun during the planning stages, she was unaware Alaniz actually brought a gun until later. In fact, Ochoa testified she told Tunchez she did not want to participate if they were going to use a gun, and Tunchez assured Ochoa she had talked to her boyfriend and no gun would be used. Ochoa stated that if Tunchez denied this, she was lying. Ochoa testified Alaniz favored bringing a gun.

According to the plan, Ochoa would wait at a bus stop until somebody picked her up. Once she was picked up, she would call the conspirators and let them know she was on her way with the intended victim. She would then direct the person to a vacant lot where three of the male conspirators, including Alaniz, would rob the victim and take his vehicle. The plan called for Tunchez and Medellin to stay at the apartment where the plan was concocted, babysitting Ochoa's son.

---

[1] Ochoa, Tunchez, and another State witness, Raul Santillan, testified Medellin sold drugs out of the apartment.
[2] There was testimony that perhaps there was a fourth male conspirator. However, the presence or absence of a fourth male conspirator at the scene is not dispositive with regard to the issue on appeal.

Ultimately, Alvarez-Huerta stopped at the bus stop and asked Ochoa if she needed a ride. Ochoa got into the vehicle. Shortly after, she made the planned call. Ochoa stated she asked Alvarez-Huerta to take her home, but directed him to drop her off at the vacant lot, explaining to Alvarez-Huerta that she lived a couple of houses down from the lot, but she had brothers and they would be angry "if they saw a guy dropping me off at the house." When she and the victim pulled up to the vacant lot, she got out of the vehicle and stood on the curb with the door open. Alvarez-Huerta asked for her phone number and Ochoa told him she would write it down for him.

Ochoa told the jury that as she was talking to the victim, she saw Alaniz "approach the truck on the driver's window, and he pulled out a gun and he had it pointed towards [the victim's] upper body." One of the other conspirators was standing on the passenger side of the victim's vehicle, and the other stood at the back of the vehicle — as planned. Alaniz demanded that the victim get out of the vehicle. Alvarez-Huerta refused and according to Ochoa, "pushed the gas." At that time, Ochoa said the gun went off. Alaniz was holding the gun and had his arm inside the victim's vehicle. The victim's vehicle jumped the curb and hit a fence. Ochoa told the jury Alaniz was standing in the middle of the street holding the gun.

Ochoa stated she ran back to Tunchez's apartment after the shooting. Eventually, the three male conspirators returned to the apartment as well. Ochoa testified one of them was driving the victim's vehicle. According to Ochoa, when Alaniz returned to the apartment, he told the others, "I think I shot him. I shot him. The gun just went off." She saw Alaniz place the gun on the counter.

Years later, after the discovery of the victim's body and a subsequent investigation, the police picked up Ochoa and took her in for questioning. Initially, Ochoa told police the men who committed the robbery were wearing masks and gloves; she did not know who they were. She did not identify any of the conspirators, nor did she tell police Alaniz shot the victim. At trial, Ochoa

explained she was scared Alaniz and the other two male conspirators might harm her or her family. After she provided police with her initial statement, she was allowed to go home.

Police picked her up a second time. This time, she identified Alaniz as the person who shot the victim. She also implicated the other two male conspirators who were at the vacant lot.

Ochoa admitted she was afraid to testify because at a previous hearing, Alaniz saw her and yelled, "Wait 'til I get my hands on you. Wait 'til I get my hands on you."

On cross-examination, Ochoa affirmed that she lied in her initial interview with police. She admitted she lied when she said the robbers wore masks, and perhaps when she implicated another man who may or may not have been there — she was unclear on this. Alaniz's attorney accused Ochoa of "fabricating this story as we go along," because she continued to add details. For example, she claimed on cross-examination that she told Tunchez that she did not want them to take a gun, and after a discussion, it was agreed there would be no gun.

When asked why it took her three years to cooperate with police, Ochoa claimed she was scared Alaniz and the others would "come after me and my family." She explained Tunchez had been her best friend and knew where her family lived. She said she ultimately decided to cooperate because "the years with this burden on me . . . I knew that that was the right thing to do. I couldn't — I couldn't no longer keep it a secret." Admittedly Ochoa never voluntarily went to law enforcement to tell them about the robbery and murder.

Ochoa also admitted her role in the offense and that she had been charged with capital murder in this case. However, she also admitted she intended to plead guilty to aggravated robbery in exchange for a maximum sentence of forty years.

In addition to Ochoa, the State also called Tunchez as a witness. Tunchez, like Ochoa, testified that she, Ochoa, Alaniz, and others were at Tunchez's apartment when they began discussing a plan to commit a robbery. Tunchez claimed the plan was hatched in order to "get

money." She said they always needed money — none of them had a legitimate job. Her boyfriend, Medellin, earned money selling drugs out of the apartment. However, she later stated that Alaniz might have had a job at McDonald's — she could not remember.

As for the plan, according to Tunchez, she was originally supposed to pretend to be a prostitute in order to lure a victim to the vacant lot. She denied that it was her idea to use a girl to lure the victim in, and stated that if Ochoa said it was Tunchez's idea, Ochoa was lying. However, it was ultimately decided that Ochoa would play the role of prostitute. Tunchez stated that after a victim was lured to the lot, the male conspirators were "[s]upposed to jack him," meaning steal from him. Tunchez testified that she understood a gun would be used to "scare" the would-be victim. She denied Ochoa's claim that Ochoa objected to the use of a gun, and denied telling anyone that Ochoa would refuse to act as bait if a gun was used. When the others left to carry out the plan, Tunchez remained at the apartment with Medellin.

Tunchez testified that later in the evening, those who had left to commit the robbery returned to the apartment. Tunchez said they were acting "nervous" and "paranoid." Ochoa told Tunchez that someone had been shot. Tunchez stated Medellin was angry because one of the men had brought the victim's vehicle back to the apartment. Medellin told them to get the truck out of there. Tunchez admitted she "smeared" the tire marks made by the truck with her hand to get rid of them — she did not want any evidence of the robbery near her apartment.

Tunchez was picked up by law enforcement on a theft charge around the same time Ochoa was taken in for questioning. Unlike Ochoa, Tunchez stated she immediately gave police the names of all of those involved in the robbery. Tunchez admitted that although she spoke to police, she did not want to get involved and did not want to testify — she was present at trial because she had been subpoenaed. She also admitted she had prior convictions for misdemeanor theft and felony theft.

During cross-examination, Tunchez revealed she had four prior misdemeanor theft convictions and that she had been convicted for prostitution. She also admitted she sometimes uses heroin, but denied it affected her memory. Tunchez confessed that she initially lied to police about "smearing" the tire tracks from the vehicle taken during the robbery. She also lied about seeing the truck on the night of the robbery. She admitted acting surprised when police told her someone was shot and killed, despite having known about it since the night it happened.

In addition to Ochoa and Tunchez, the State called a third witness who was there the night the conspirators planned and executed the robbery. Raul Santillan testified he was a longtime friend of Medellin and was friends with the other male conspirators. He stated he was at the apartment the night Alvarez-Huerta was killed. He denied any involvement in the planning or execution of the robbery, but admitted he was present at Tunchez's apartment that night. Tunchez confirmed that Santillan was there the night of the robbery, but claimed he had not been in the back bedroom where the planning had taken place.

Santillan testified he was standing outside of the apartment, specifically outside the kitchen door, which was open. He overheard four of the male conspirators discussing the plan to rob someone by using Ochoa as bait. Contrary to Tunchez, Santillan said this took place outside the apartment, not in the back bedroom of the apartment. Santillan stated he later saw Ochoa leave with the men. Santillan testified he heard Alaniz ask Medellin if he could borrow a gun in case anything went wrong during the robbery. Although he never actually saw Medellin give a gun to Alaniz, he saw Alaniz make certain movements that suggested to him Alaniz tucked a gun under his shirt.

Santillan stated he remained at the apartment with Tunchez and Medellin, but soon after the men left with Ochoa, he heard a gunshot as he was standing outside the apartment; the robbery took place just a few blocks away from the apartment. Santillan told the jury that shortly after he

heard the gunshot, the four male conspirators he overheard discussing the robbery, as well as Ochoa, returned to the apartment. He stated they all seemed "scared" and in shock.

Santillan testified Alaniz stated he accidentally shot the victim — that the gun "went off" when the victim attempted to flee. Santillan stated the men removed the victim's body from the vehicle and threw it into the weeds at the vacant lot. This, along with the decision to bring the victim's vehicle back to the apartment, angered Medellin. Santillan stated he told the men to "clean up their mess" and "get it out of the neighborhood" because it would "bring too much heat." Thus, the men left and ultimately took the body to a remote location. Santillan and Medellin also insisted that the victim's vehicle be taken away from the apartment.

Santillan admitted he never went to the police. He reasoned that he was not involved, so it was not his concern. He also admitted he had previously been convicted of misdemeanor theft. In addition, he admitted to two prior drug convictions. At the time of the robbery and murder, Santillan had just been released from prison, but was on parole.

On cross-examination, Santillan again stated he was on parole on the night of the robbery. Despite being on parole, Santillan admitted he was selling drugs at the apartment. Santillan's testimony conflicted with some portions of that given by Ochoa and Tunchez. Santillan claimed he never saw the four male conspirators in the bedroom of the apartment, and claimed Medellin would never have allowed four men in the same bedroom as Tunchez. He also denied, contrary to statements by the women, that Medellin would allow other males, even friends, to spend the night at the apartment. He claimed Alaniz was in the victim's vehicle when it was driven to the apartment, which appears contrary to testimony by the women that another conspirator arrived alone in the vehicle. Contrary to Tunchez's testimony, Santillan told the jury Medellin helped Tunchez eradicate the tire marks from the parking lot that were left by the victim's vehicle.

Santillan admitted that when he spoke to police, he denied knowing anything. He did not tell them anything right away, "[i]t took a while." When he finally began to tell police what he knew, he did not initially tell them about the conversation between Alaniz and Medellin regarding the gun. Nor did he tell police he saw something that led him to believe Alaniz put a gun under his shirt.

In addition to these three witnesses, the State presented testimony from: (1) law enforcement personnel regarding the investigation and the ultimate arrest of those involved; (2) the medical examiner, who stated the victim had a gunshot wound to the left side of his head; (3) a forensic scientist who talked about identification of the victim through the use of DNA; (4) the victim's relatives, who testified about the victim's activities on the night he disappeared; and (5) the equipment operator from Bexar County Public Works who discovered the body. Law enforcement personnel testified about the recovery of the victim's vehicle and the blood and other items found therein. They also presented evidence about the subsequent recovery of the victim's body, which was found long after the robbery in some shrubbery in a rural area away from where the robbery took place. However, the State relied, for the most part, on the testimony of Ochoa, Tunchez, and Santillan to implicate Alaniz in the murder of Alvarez-Huerta.

After the State presented its case, Alaniz called two witnesses for the defense. The first witness was Rachel Pena, Alaniz's cousin. She testified that during the time period in which the robbery occurred, Alaniz had a job at McDonald's. This testimony was obviously presented to contradict Tunchez's claim that no one in the group had a job and they all needed money. Ms. Pena could not recall if Alaniz was working on the actual night of the robbery and murder.

The second witness, Michael Fortney, was an investigator for the defense. Mr. Fortney testified that he served a subpoena on McDonald's in an attempt to obtain Alaniz's work records.

He stated the defense had served several subpoenas in an effort to obtain the records. According to Mr. Fortney, McDonald's was unable to locate the records, but he was still expecting a response.

The investigator also gave testimony about the distance between the murder scene, the victim's home, and the location where the victim had apparently dropped off a co-worker earlier in the evening. The defense suggested that if Alvarez-Huerta had dropped off the co-worker and driven home, as he apparently claimed he planned to do, he would not have driven past the bus stop where Ochoa was waiting.

After Alaniz rested, both sides closed. After final arguments by the State and the defense, the jury began its deliberations, ultimately finding Alaniz guilty of murder. The trial court sentenced him to life in prison. Alaniz then perfected this appeal.

## ANALYSIS

In a single point of error, Alaniz contends the evidence is insufficient to support his conviction. Specifically, Alaniz argues the State's two main witnesses, Ochoa and Tunchez, lack credibility. He points out that they had reason to curry favor with police: "favorable treatment on pending criminal prosecutions." Moreover, both lied to police when first contacted, and both had "extensive criminal records." Alaniz contends that in the absence of other credible evidence, his conviction cannot stand.

### *Standard of Review*

In reviewing the legal sufficiency of the evidence in a criminal case, an appellate court uses the standard established by the United States Supreme Court in *Jackson v. Virginia. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd). In reviewing a legal sufficiency claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Mayberry*, 351 S.W.3d at 509 (citing *Jackson*, 443 U.S. at 319). We must therefore defer to the jury's weighing of the evidence, resolution of conflicts in the testimony, and assessment of credibility. *Brooks*, 323 S.W.3d at 899; *see also Jackson*, 443 U.S. at 319 (taking into account trier of fact's duty to resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts).

This standard requires an appellate court to resolve any inconsistencies in the testimony in favor of the verdict. *Gonzales v. State*, 330 S.W.3d 691, 694 (Tex. App.—San Antonio 2010, no pet.) (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)). Thus, in analyzing the legal sufficiency of the evidence, this court must determine whether the necessary inferences are reasonable based on the combined force of the evidence, direct and circumstantial, when viewed in the light most favorable to the verdict. *Mayberry*, 351 S.W.3d at 509 (citing *Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007)); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (holding standard of review is same for both direct and circumstantial cases).

Moreover, an appellate court must remain mindful not to reweigh the evidence or substitute its judgment for that of the jury. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and the jury may accept or reject all or any part of a witness's testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts; and it is their sole province to reconcile any evidentiary conflicts. *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

### *Application*

As noted above, the single argument presented by Alaniz is that the State's two main witnesses were not credible. Admittedly, Ochoa and Tunchez lied to police and had prior criminal

records. However, the standard of review applicable to legal sufficiency challenges specifically states the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and it is the jury alone who may decide to accept or reject all or any part of a witness's testimony. *Lancon*, 253 S.W.3d at 707. We must defer to the jury's assessment of credibility. *See Brooks*, 323 S.W.3d at 899. We may not reweigh the evidence or substitute our judgment for that of the jury. *King*, 29 S.W.3d at 562.

The jury obviously found Ochoa's and Tunchez's testimony credible. Clearly, the jury believed Ochoa when she testified Alaniz had a gun. The jurors evidently believed Ochoa's statement that Alaniz shot the victim. Accordingly, given the single argument presented by Alaniz, we cannot say the evidence is insufficient.

## CONCLUSION

Based on the foregoing, we overrule Alaniz's point of error and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish